1
2
3
4
5
6
7

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRIENDS OF YOSEMITE VALLEY, a non-profit corporation; and MARIPOSANS FOR ENVIRONMENTALLY RESPONSIBLE ) GROWTH, ) ) Plaintiffs, ) ) v. ) ) ) P. LYNN SCARLETT, in her official capacity as Acting Secretary of the Interior, *et al.*, ) ) Defendants. ) ) | CV F 00-6191 AWI DLB MEMORANDUM OPINION AND ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT [Docs. 271, 276] |

In 1987, Congress designated the Merced River in Yosemite National Park as a component of the National Wild and Scenic Rivers System.  Pub. L. 101-49, 101 Stat. 879, 16 U.S.C. § 1274(a)(62).  Under the Wild and Scenic Rivers Act ("WSRA") , 16 U.S.C. § 1271 et seq, the National Park Service ("NPS") was obligated to prepare a comprehensive management plan ("CMP") for the Merced River within three fiscal years of its designation

1    under WSRA.  16 U.S.C. § 1274(d).  It did not do so.

2        In February of 1999, Mariposans for Environmentally Responsible Growth and the

3    Sierra Club filed a lawsuit against NPS concerning a road widening project with the Merced

4    River corridor.  Sierra Club v. Babbit, 60 F.Supp.2d 1202 (E.D. Cal. 1999).  In that lawsuit,

5    the plaintiffs argued in part that the road project violated WSRA's requirement that NPS

6    protect and enhance the values and free-flowing character of the Merced River.  On July 12,

7    1999, this court enjoined part of the project and ordered NPS to complete a valid CMP

8    pursuant to WSRA by July 2000.   NPS issued the Record of Decision adopting the 2000

9    Merced Wild and Scenic River Comprehensive Management Plan on August 9, 2000.

10       In present action,  Friends of Yosemite Valley and MERG (collectively "Plaintiffs")

11   initially challenged the 2000 Merced Wild and Scenic River Comprehensive Management

12   Plan ("2000 MRP") and Final Environmental Impact Statement ("2000 FEIS"), and the

13   August 9, 2000 Record of Decision ("2000 ROD") implementing the 2000 MRP and the

14   2000 FEIS.   Plaintiffs contended that Defendants had failed to prepare a valid  CMP  that

15   protects and enhances the natural values of the Merced River in Yosemite National Park in

16   compliance with WSRA and had also violated the National Environmental Policy Act, 42

17   U.S.C. § 4321 et seq., ("NEPA"), and the Administrative Procedures Act, 5 U.S.C. § 701, et

18   seq., ("APA").

19       On March 22, 2002, this court issued its opinion generally upholding the 2000 MRP.

20   See Friends of Yosemite Valley v. Norton, 194 F.Supp.2d 1066 (E.D.Cal. 2002), reversed in

21   part and remanded, 348 F.3d 789 (9th Cir. 2003).  This court did find that Plaintiffs were

22   entitled to declaratory judgment and injunctive relief on their third cause of action for

23   violation of the requirement pursuant to 16 U.S.C.  Section 1274(a)(62)(A) to adopt

24   appropriate revisions to the Yosemite General Management Plan.  Friends of Yosemite, 194

25   F.Supp.2d. at 1071.

26       Plaintiffs appealed portions of this court's ruling and the United States Court of

27

28                                             2

Appeals for the Ninth Circuit entered its opinion on October 27, 2003, reversing this court's opinion in part by finding that the 2000 MRP violated WSRA by: 1) insufficiently addressing user capacities; and  2) improperly setting river area boundaries within the El Portal administrative site.   <u>Friends of Yosemite</u>, 348 F.3d at 803.   The court further found that the 2000 MRP and its EIS contained sufficient data for a programmatic plan under WSRA and NEPA, and that the NPS did not violate its duty to cooperate with water pollution agencies. The portion of the Ninth Circuit's opinion which is now particularly relevant provides as follows:

### A. User Capacities

The district court erred in determining that the CMP adequately  "address[ed] ... user capacities" as required by § 1274(d)(1).  The current CMP is deficient in its approach to user capacities because its principal method for addressing user capacities, the VERP framework, contains only sample standards and indicators.  Thus, the CMP fails to yield any actual measure of user capacities, whether by setting limits on the specific number of visitors, by monitoring and maintaining environmental and experiential criteria under the VERP framework, or through some other method.

The WSRA explicitly requires administering agencies to "prepare a[CMP] ... [that] shall address ... user capacities" within three full fiscal years of a WSRS segment's designation.  Id. § 1274(d)(1).  However, § 1274(d)(1) does not define the phrase "address ... user capacities."  In the absence of a statutory definition of the phrase, we look to the plain meaning of its terms.  <u>See</u> <u>Hells Canyon Alliance</u>, 227 F.3d at 1177.  "Address" means to "deal with or discuss."  Random House Webster's College Dictionary 16 (1991).  "User" is defined as "a person or thing that [avails oneself of something]," <u>id.</u> at 1468, and "capacity" is "the maximum number that can be received or  contained."  Id. at 201.  Thus, applied to this case, the plain meaning of the phrase "address ... user capacities," is simply that the CMP must deal with or discuss the maximum number of people that can be received at a WSRS.  Based on this plain meaning, we do not read § 1274(d)(1) to require that the administering agency advance one particular approach to visitor capacity in all circumstances (e.g., a head count of all entrants to Yosemite).

This interpretation of § 1274(d)(1) is buttressed by the interpretive guidelines jointly published in 1982 by the Secretary of Agriculture and the Secretary of the Interior.  These "Secretarial Guidelines" are crafted to facilitate greater consistency in the agencies' interpretation of the WSRA. See National Wild and Scenic Rivers System:  Final Revised Guidelines for Eligibility, Classification and Management of River Areas, 47 Fed. Reg. 39,454 (Sept. 7, 1982) (the "Secretarial Guidelines").  We defer to the Secretarial Guidelines as an exercise of the administering agencies' authority to resolve ambiguities in the statute they administer.  <u>See</u> <u>United States v. Mead</u>, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

The Secretarial Guidelines interpret the WSRA to require the preparation of river "[m]anagement plans [that] state ... the kinds and amounts of public use which the river area can sustain without impact to the [ORVs]," and to mandate ongoing studies to "determine the quantity and mixture of recreation and other public use

3

which can be permitted without adverse impact on the resource values of the river area." 47 Fed. Reg. at 39, 458-59.  Although these references to setting limits on the amount or quantity of public use clarify that the WSRA obliges the administering agency to provide actual limits in its CMP, the Secretarial Guidelines do not specify that this obligation can be satisfied only by capping the number of visitors.  Thus, we interpret § 1274(d)(1)'s instruction that a CMP must "address ... user capacities" to require only that the CMP contain specific measurable limits on use.  See also id. at 39,459 (explaining that § 1281(a) states "a nondegradation and enhancement policy for all designated river areas, regardless of classification").

This does not mean that the NPS is precluded from using the VERP to fulfill the user capacities requirement.  However, the WSRA does require that the VERP be implemented through the adoption of quantitative measures sufficient to ensure its effectiveness as a current measure of user capacities.  If the NPS is correct in projecting that it will need five years fully to implement the VERP, it may be able to comply with the user capacity mandate in the interim by implementing preliminary or temporary limits of some kind.

Because the present version of the CMP fails to provide any concrete measure of use, we conclude that it fails sufficiently to address user capacities.  Indeed, we note that the NPS's proposed five-year timetable for the implementation of the VERP framework would not satisfy § 1274(d)(1)'s three-full-fiscal-year timetable even if the NPS were to have begun implementation of the VERP immediately upon Congress' designation of the Merced.   On remand, the NPS shall adopt specific limits on user capacity consistent with both the WSRA and the instruction of the Secretarial Guidelines that such limits describe an actual level of visitor use that will not adversely impact the Merced's ORVs.

**B. WSRA Boundaries at El Portal**

The NPS violated the WSRA by drawing the boundaries at the Merced's El Portal administrative site too narrowly.  The WSRA requires a CMP to delineate river boundaries that "include an average of not more than 320 acres of land per mile measured from the ordinary high water mark on both sides of the river."  §16 U.S.C. 1274(b).  The CMP sets the river boundaries for the seventy-seven miles of the Merced that do not flow through El Portal at a distance of one-quarter mile from the ordinary high water mark on either side of the river.  These boundaries are consistent with the statutory acre-age maximum.  However, for the approximately four miles flowing through El Portal, the CMP sets the river boundaries to include only the greater of the RPO or the one-hundred-year floodplain, plus adjacent wetlands and meadows.

We have not yet decided a case involving WSRA river boundaries, but one of our sister circuits has reasoned that the setting of boundaries is an "administrative act" that falls within the agency's statutory duty to administer the river area "in such manner as to protect and enhance the [ORVs]  which caused it to be included in the [WSRS]." Sokol v. Kennedy, 210 F.3d 876, 878 (8th Cir.2000) (remanding for redetermination of boundaries consistent with §16 U.S.C. 1281(a)).  Although Sokol involved boundaries that were potentially overinclusive, because they were not drawn on the basis of the statutorily-required "outstandingly remarkable values" criterion, we agree with the Eighth Circuit's analytic approach.  Accordingly, we conclude that the boundaries at El Portal are deficient because they were not devised pursuant to § 1281(a)'s protection and enhancement mandate.

While the CMP associates specific ORVs with El Portal, the record does not reflect the precise location of these ORVs or how, in drawing the boundaries, the NPS sought to protect them.  The CMP lists five categories of ORVs for El Portal, and

provides the following descriptions:

*Geologic Processes/Conditions* --This segment contains a transition from igneous to metasedimentary rocks (metasedimentary rocks are among the oldest in the Sierra Nevada).

*Recreation*--This segment provides a range of river-related recreational opportunities, in particular white-water rafting and kayaking (class III to V) and fishing.

*Biological*--This segment contains riverine habitats such as riparian woodlands and associated federal and state special status species, including Tompkin's sedge and Valley elderberry longhorn beetle and its critical habitat (elderberry shrub).  Expanses of north-facing habitat allow unlimited access to the riparian zone for wildlife species.

*Cultural*--This segment contains some of the oldest archeological sites in the Yosemite area, as well as many historic Indian villages and traditional gathering places.  River-related historic resources include structures related to early tourism and industrial development.

*Hydrological Processes*--This segment is characterized by continuous rapids. The El Portal segment also falls under the general "scientific" ORV identified by the CMP for the river's main stem "because the river watershed is largely within designated Wilderness in Yosemite National Park."

The record reflects that some of El Portal's ORVs are not protected by the present boundaries and, indeed, that not all of El Portal's ORVs have been fully located.  For example, the CMP points out a significant deficiency with respect to El Portal's cultural ORVs:

A systematic inventory for ethnographic resources has not been undertaken for El Portal.... [S]everal individuals and families have traditional ties to this area. Redbud, willow, sourberry, and other plant materials are known to be gathered here.  There are at least three known cemeteries, two of which were used in historic times and are the burial places for ancestors of some local Indian families.

In addition, although the CMP notes that a "comprehensive evaluation of cultural landscapes and historic structures at the El Portal Administrative Site, based on National Register criteria, has been completed," it does not discuss whether such landscapes and structures are located within the present boundaries or if their protection and enhancement were considered when the boundaries were drawn. Indeed, the record reflects that NPS employees expressed concern about the effect of the boundaries on cultural ORVs during the drafting stage of the CMP. For example, one employee noted that "there are river-related archeological sites, considered part of the cultural resource ORV in El Portal, that lie outside the 100-y[ea]r floodplain ... that would be directly and adversely affected by administrative purposes (e.g., construction of employee housing at Hillside West)."  Such omissions demonstrate that the CMP's boundaries at El Portal could not possibly have been promulgated to protect and enhance such ORVs.

In concluding that the river boundaries at El Portal were improperly drawn, we do not, as the NPS fears, establish "a preference for ... includ[ing] the absolute maximum number of acres on every part of the designated river," or place a "special burden of justification on an agency if it chooses less than the absolute maximum average."  Instead, we hold that there is one burden of justification that generally applies to an administering agency's determination of river boundaries:  Boundaries set within the WSRA's acreage requirement, regardless where such boundaries fall within the statutory range, must be drawn  so as to protect and enhance the ORVs

5

causing that area to be included within the WSRS. See §16 U.S.C. 1281(a); <u>Sokol</u>, 210 F.3d at 879; 47 Fed. Reg. at 39,459. Because the NPS failed to apply this standard, the CMP's present boundaries at El Portal were not determined in accordance with law. Accordingly, on remand the NPS must redetermine the river area boundaries at El Portal under the proper standard. See 5 U.S.C. 706(2)(A).

<u>Friends of Yosemite v. Norton</u>, 348 F.3d at 796-799. The Ninth Circuit summarized its holding as follows:

> **V. CONCLUSION**
> For the reasons stated, we conclude that the CMP and its EIS contain sufficient data for a programmatic plan under the WSRA and NEPA, and that the NPS did not violate its duty to cooperate with water pollution agencies as required by §16 U.S.C. 1283(a). We further conclude that the CMP violates the WSRA by insufficiently addressing user capacities and improperly setting river area boundaries within El Portal. We remand for the district court to enter an appropriate order requiring the NPS to remedy these deficiencies in the CMP in a timely manner. Inasmuch as the NPS was supposed to have completed a CMP for the Merced River some twelve years ago, we would also expect that the NPS would implement, as soon as is practicable, temporary or provisional measures designed to avoid environmental degradation pending the completion of its task.

<u>Id</u>. at 803-04.

On remand, NPS advised this court and Plaintiffs that it planned to proceed with several projects in the Yosemite Valley segment of the Merced River corridor in Yosemite National Park, which were tiered to the 2000 MRP and the Yosemite Valley Plan. Plaintiffs then moved for injunctive relief to prevent NPS from implementing those projects. On March 26, 2004, the court entered an order finding that the Ninth Circuit had not invalidated the 2000 MRP as a whole and denying Plaintiffs' request for a broad injunction halting all projects tiered to the 2000 MRP.

Plaintiffs appealed. On April 20, 2004, the Ninth Circuit issued an order clarifying its October 27, 2003 opinion and explaining that it had held the entire 2000 MRP to be invalid. It remanded the matter to this court for reconsideration of Plaintiffs' motion in light of this clarification. <u>Friends of Yosemite Valley v. Norton</u>, 366 F.3d 731 (9th Cir. 2004).

On July 6, 2004, following a further round of briefing, this court vacated its March 26 order and directed NPS to comply with the Ninth Circuit's April 20 order by "remedying in a

timely manner the deficiencies found in the 2000 MRP, i.e., insufficient addressing of user capacities and improper setting of river area boundaries within El Portal." It also ordered NPS to  comply with NEPA by issuing a supplemental EIS.  This court enjoined two projects: the Curry Village Campgrounds Project and the East Yosemite Valley Utilities Improvement Plan, pending completion of a new or revised CMP for the Merced River.  With Defendants' consent, the court enjoined NPS "from implementing projects and activities relating to Yosemite Lodge Development, the Yosemite Village Parking and Transit Area Improvements (Camp 6 Parking Lot), Curry Village Cabins, and the Camp Wawona Redevelopment and Proposed Land Exchange" until completion of a new or revised CMP. The court denied Plaintiffs' motion for injunctive relief in other respects and allowed a number of projects to proceed, including the El Portal Office Building Annex, Curry Village Employee Dorms, the South Fork Bridge Replacement Project, tree stump removal, and data collection efforts.  Finally, the court reiterated the finding that NPS would be required to provide specific references to the line or page numbers of the Park's 1980 GMP, which would be amended by the new or revised river plan.  The court directed that the injunction remain in place until "the NPS completes the new or revised CMP," which this court ordered the agency to complete within one year.

NPS published a notice of intent to prepare an environmental impact statement on the Revised Merced River Plan/SEIS in the Federal Register on July 27, 2004.  A series of public scoping meetings were held in mid-August in Oakland, Mariposa, Yosemite Valley, and El Portal, California.  In response to public comment, the public scoping period was extended by two weeks and closed on September 10, 2004.  The Draft Merced Wild and Scenic River Revised Comprehensive Management Plan and Supplemental Environmental Impact Statement was released for public review in January 2005.  The Notice of Availability was published in the Federal Register on January 14, 2005, and the official review period continued through March 22, 2005.  The Record of Decision for the Merced Wild and Scenic

River Revised Comprehensive Management Plan was signed on July 25, 2005, adopting Alternative 2 from the SEIS.

NPS issued a two-volume publication entitled, "Merced Wild and Scenic River Revised Comprehensive Management Plan and Supplemental Environmental Impact Statement" ("2005 Revised Plan") in June 2005. With the completion of the 2005 Revised Plan, the court ruled on October 27, 2005, that its July 6, 2004 injunction expired by its own terms and was no longer in effect.

On November 11, 2005, Plaintiffs lodged their First Supplemental Complaint, alleging five causes of action against Defendants and challenging the 2005 Revised Plan under WSRA, NEPA and the APA. On December 2, 2005, Defendants filed an Answer to the Supplemental Complaint, and lodged the Administrative Record for the 2005 Revised Plan. Pursuant to a stipulation of the parties, the case now proceeds on cross motions for summary judgment. Oral argument was presented on May 1, 2006.

**LEGAL STANDARD**

Absent a separately-created right of action, the review of final agency action is governed by the Administrative Procedure Act under an "arbitrary or capricious" standard. 5 U.S.C. § 706(2)(A). Absent a showing of arbitrary action, a court must assume that an agency has exercised its discretion appropriately. Kleppe v. Sierra Club, 427 U.S. 390, 412 (1976). Thus, the standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." Independent Acceptance Co. v. California, 204 F.3d 1247, 1251 (9th Cir. 2000)(internal quotations omitted.). An agency's decision should be overturned if it was "arbitrary, capricious, an abuse of discretion, other otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); Idaho Farm Bureau Fed'n v. Babbit, 58 F.3d 1392, 1401 (9th Cir. 1995). The Ninth Circuit has explained review of agency decisions as follows:

> Review under the arbitrary and capricious standard is narrow and the reviewing court may not substitute its judgment for that of the agency. Marsh v. Oregon Natural

8

Resources Council, 490 U.S. 360, 376, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (Marsh).  We must determine whether the agency's decision was made after considering the relevant factors and whether the agency made a clear error of judgment.  Id. at 378, 109 S.Ct. at 1861.  We may reverse the agency's decision as arbitrary or capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  Dioxin/Organochlorine Center v. Clarke, 57 F.3d 1517, 1521 (9th Cir. 1995).

Western Radio Services Co., Inc.  v. Espy, 79 F.3d 896, 900 (9th Cir. 1996), cert. denied, 117 S.Ct. 80 (1996).

In the present case, Plaintiffs contend that Defendants are not entitled to the presumption discussed in Kleppe  that  NPS has exercised its discretion appropriately.  Rather, Plaintiffs argue that because the Ninth Circuit found that NPS violated WSRA in regard to user capacities and the El Portal boundaries, it has already been found to have acted arbitrarily in this case, and it is not entitled to the presumption that it has exercised its discretion appropriately.  Plaintiffs also emphasize that courts have found that NPS violated the law in regard to Yosemite National Park on at least three different occasions in the last six years.  See Sierra Club v. United States, 23 F.Supp.2d 1132, 1134 (N.D. Cal. 1998) (substantial likelihood NPS violated NEPA); Sierra Club v. Babbitt, 69 F.Supp.2d 1202, 1263 (E.D. Cal. 1999) (NPS violated WSRA and NEPA); Friends of Yosemite, 348 F.3d at 797, 799, 803 (NPS violated WSRA).   Plaintiffs conclude that under these circumstances, NPS is not entitled to any presumption of compliance with the law in this instance.  In response, Defendants argue that the Ninth Circuit's finding that it had violated WSRA in two respects was not based on the conclusion that  it had acted arbitrarily and capriciously, but rather on the court's legal interpretation of WSRA.

In ruling on this case, the Ninth Circuit  repeated the well-known standard that an agency's decision will be set aside "only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  Friends of Yosemite Valley, 348 F.3d at 793, quoting Hells Canyon Alliance v. United States Forest Serv., 227 F.3d 1170, 1176-77 (9th

9

Cir. 2000).   The court found that "[t]he current CMP is deficient in its approach to user capacities because its principal method for addressing user capacities, the VERP framework, contains only sample standards and indicators," and that "[t]he NPS violated WSRA by drawing the boundaries at the Merced's El Portal administrative site too narrowly."  Friends of Yosemite Valley, 348 F.3d at 796, 797.   Nowhere in its opinion does the court make a finding regarding the actual nature of the NPS decision, i.e., whether it was  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.  Because this standard contains the catch-all "otherwise not in accordance with the law," this court cannot find that the Ninth Circuit necessarily determined that the NPS's decision was arbitrary, capricious or an abuse of discretion.  Significantly, Plaintiffs have not provided the court with any direct authority for the proposition that a reversal of an administrative agency's decision by the appeals court results in the application of a different standard of review when the same issue comes before the district court on remand.  Accordingly, this court concludes that the regular APA standard for the review of agency decisions applies in this case.

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System, 368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710 (9th Cir. 1985); Loehr v. Ventura County Community College Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

> Under summary judgment practice, the moving party
> [A]lways bears the initial responsibility of informing the
> district court of the basis for its motion, and identifying those
> portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the
> affidavits, if any," which it believes demonstrate the absence of
> a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)   Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a

10

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Ruffin v. County of Los Angeles, 607 F.2d 1276, 1280 (9th Cir. 1979), cert. denied, 455 U.S. 951 (1980).

The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank, 391 U.S. at 290; T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); International Union of Bricklayers v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

**UNDISPUTED FACTS**

Both parties to this action have filed statements of undisputed facts, to which the other party has responded. The court finds, however, that Defendants' Response to Plaintiffs' Concise Statement of Facts fails to comply with the Local Rules for the Eastern District. Local Rule 56-260 provides in part as follows:

> **(b) Opposition.**   Any party opposing a motion for summary judgment or summary adjudication shall reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts which are undisputed and deny those which are disputed, including with each denial a citation to the particular portions of any pleadings, affidavit, deposition, interrogatory answer, admission or other document relied upon in support of that denial.

In this case, Defendants have reproduced each of the 38 itemized facts in Plaintiffs' Concise Statement of Facts and have stated whether they dispute each fact. They fail, however, to provide any citation to any portion of the administrative record relied upon in support of that denial. This is particularly egregious as Defendants' response to many of Plaintiffs' facts is a claim that the fact mischaracterises the administrative record. This court considered ordering Defendants to file a response to Plaintiffs' Concise Statement of Facts that would comply with the Local Rules, but in an effort to expedite resolution of this case, will not to do so. Defendants are cautioned, however, that any future response to a statement of facts filed in connection with a motion for summary judgment in this or any other case filed before the undersigned must be in compliance with Local Rule 56-260(b).

The undisputed facts regarding the procedural history of this case are set forth above. The facts regarding the contents of the administrative record are discussed below.

## DISCUSSION

**Subject Matter Jurisdiction**

Defendants contend that this court lacks subject matter jurisdiction to review Plaintiffs' challenge to the 2005 Revised Plan. Previously, in response to Plaintiffs' challenge to the 2000 MRP, Defendants raised two jurisdictional challenges: 1) Plaintiffs' claims were not ripe for judicial review; and 2) Plaintiffs lacked standing. This court rejected those challenges in its decision issued March 22, 2002. <u>Friends of Yosemite Valley v.</u>

Norton, 194 F.Supp.2d 1066, 1074 - 1080.  Defendants did not appeal this court's ruling on

the jurisdictional issue and the Ninth Circuit did not address it.

Defendants claim that a significant new development has occurred since this court's

March 22, 2002 ruling and the Ninth Circuit's October 2003 ruling on appeal, which requires

this court to dismiss Plaintiffs' claims.  This new development is the issuance of the opinion

in Norton v. Southern Utah Wilderness Alliance, 524 U.S. 55 (2004) ("SUWA").  SUWA

involved three claims, one of which was that the Bureau of Land Management ("BLM") had

failed to meet its statutory mandate under the Federal Land Policy Management Act

("FLPMA"), 43 U.S.C. Section 1782(c).  The particular provision at issue directed the BLM

"not to impair the suitability" of potential wilderness areas.  Id. at 2377. The plaintiffs in

SUWA alleged that off-highway vehicle use was damaging potential wilderness areas on

BLM lands in Utah, and they brought suit under APA Section 706(1), alleging a failure to

comply with FLPMA and seeking an order to compel the agency to fulfill its "nonimpairment

obligation."  Id. at 2378.  The Tenth Circuit held that the FLPMA  nonimpairment mandate

constituted a "mandatory, nondiscretionary duty" of the BLM that could be compelled under

Section 706(1) of the APA.  Id.

The Supreme Court granted certiorari and unanimously reversed the decision of the

Tenth Circuit.   The Court defined the issue in the case as whether "the authority of a federal

court under the .   .   . (APA) to 'compel agency action unlawfully withheld or unreasonably

delayed,' 5 U.S.C. § 706(1), extends to the review of the [BLM's] stewardship of public

lands under certain statutory provisions and its own planning documents."  Id. at 57 -58.  The

Court held that "a claim under Section 706(1) can proceed only where a plaintiff asserts that

an agency failed to take a *discrete* agency action that it is *required* to take."  Id. at 64.  The

Court also explained the limits the APA places on judicial review as follows:

> Where no other statute provides a private right of action, the "agency action"
> complained  of must be " *final* agency action." § 704 (emphasis added). "Agency
> action" is defined in § 551(13) to include "the whole or a part of an agency rule, order,
> license, sanction, relief, or the equivalent or denial thereof, *or failure to act*."

(Emphasis added.) The APA provides relief for a failure to act in § 706(1): "The reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed."  Sections 702, 704, and 706(1) all insist upon an "agency action," either as the action complained of (in §§ 702 and 704) or as the action to be compelled (in § 706(1)). The definition of that term begins with a list of five categories of decisions made or outcomes implemented by an agency--"agency rule, order, license, sanction [or] relief." § 551(13). All of those categories involve circumscribed, discrete agency actions, as their definitions make clear: "an agency statement of ... future effect designed to implement, interpret, or prescribe law or policy" (rule); "a final disposition ... in a matter other than rule making" (order); a "permit ... or other form of permission" (license); a "prohibition ... or taking [of] other compulsory or restrictive action" (sanction); or a "grant of money, assistance, license, authority," etc., or "recognition of a claim, right, immunity," etc., or "taking of other action on the application or petition of, and beneficial to, a person" (relief). §§ 551(4), (6), (8), (10), (11).

Id. at 61 -62.  Based on these standards the Court held that the BLM's alleged failure to act was not remediable under the APA, because the plaintiffs alleged general deficiencies in compliance which lacked the specificity requisite for agency action.  Id. at 66 - 67.

An obvious distinction between the SUWA case and the case before this court is that SUWA involved a claim that a federal agency  had failed to act, while Plaintiffs in the present case challenge, at least to some degree, an affirmative action by Defendants. Defendants claim, however, that  SUWA's holding is not limited to challenges to agency actions unreasonably delayed or unlawfully withheld pursuant to Section 706(1) of the APA. Rather, they argue, the holding applies equally to a final agency action under the remaining APA provisions, including Section 704 and Section 706(2)(A) - (D).  The court agrees.  See SUWA, 542 U.S. at 62 ("[s]ections 702, 704, and 706(a) all insist upon an 'agency action,' either as the action complained of (in §§ 702 and 704) or as the action to be compelled (in § 706(1)).")

Applying SUWA to the present case, Defendants argue that Plaintiffs, by seeking review of  NPS's general adoption of the 2005 Revised Plan, rather than challenging a discrete final agency action taken pursuant to that plan, have filed the same type of programmatic challenge to the overall management of the Merced River areas that the

14

1   Supreme Court rejected in <u>SUWA</u>..  Central to Defendant's argument is their claim that

2   Plaintiffs have not challenged any one of the five discrete "agency actions" listed in APA §

3   551(13).  Defendants claim that to the contrary, Plaintiffs seek judicial intervention into the

4   type of broader-scale planning effort, which, under <u>SUWA</u>, is outside the permissible scope

5   of judicial review under the APA.

6        Defendants also discuss a recent Ninth Circuit case which interprets <u>SUWA</u>.  In

7   <u>Center for Biological Diversity v. Veneman</u>, 394 F.3d 1108 (9th Cir.  2005), the plaintiffs

8   alleged that the United States Forest Service had violated WSRA by failing to consider

9   certain rivers as potential segments of the Wild and Scenic Rivers System while planning for

10  the use and development of water and related land resources in Arizona national forests.  On

11  rehearing, the Ninth Circuit held that under <u>SUWA</u> ,the Forest Service's failure to consider

12  the rivers when engaging in federal land planning was not a discrete agency action that would

13  permit review under the APA.   The court therefore affirmed the district court's dismissal for

14  lack of subject matter jurisdiction.  <u>Veneman</u>,  394 F.3d at 1113.

15       Defendants contend  that Plaintiffs' Supplemental Complaint similarly fails to

16  challenge a discrete final "agency action" under WSRA.  Defendants argue that Plaintiffs

17  challenge the 2005 Revised Plan in the abstract, but that the 2005 Revised Plan does not

18  constitute a "rule, order, license, sanction, or relief," as required for judicial review under the

19  APA.  Defendants suggest that if and when NPS does take a reviewable final agency action

20  regarding a specific implementation project to which Plaintiffs object, they could attempt to

21  challenge that action under Sections 704 and 706(2)(A)-(D) of the APA, provided that the

22  action in question qualifies as one of the five categories of "agency action" defined in the

23  APA.

24       In response, Plaintiffs contend that they have standing to pursue this action and that

25  the court has subject matter jurisdiction.  In support of standing, Plaintiffs assert that the

26  decisions made by NPS in the 2005 Revised Plan and ROD will cause them and their

27

28                                                15

members injuries that are within the zone of interests of WSRA and NEPA.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 - 61 (1992) (constitutional minimum of standing contains three elements of injury in fact, casual connection between the injury and the conduct complained of, and likelihood that the injury will be redressed by a favorable decision).

Defendants clarify their position in their Memorandum Opposing Plaintiffs' Motion for Summary Judgment and Reply Supporting Defendants' Motion for Summary Judgment, explaining that they do not challenge Plaintiffs' Article III standing.  Rather, they state, the reference to standing arose in the context of their discussion of Veneman, in which the Ninth Circuit found that because the plaintiff failed to allege a discrete agency action that the Forest Service had failed to take, the plaintiff had no standing under Section 706(1).  Veneman, 394 F.3d at 1113.

In regard to subject matter jurisdiction, Plaintiffs first argue that Defendants are wrong in claiming that the requirements of the APA implicate a court's jurisdiction.  It is difficult to reconcile this argument with the decisions in SUWA (upholding trial court's dismissal for lack of subject matter jurisdiction) and Veneman (after finding Plaintiffs had no standing, and "given the Supreme Court's holding in SUWA,"  affirming the trial court's dismissal for lack of jurisdiction).   The court therefore rejects this argument.

Plaintiffs next argue that if they must allege final agency action subject to review under the APA to establish subject matter jurisdiction, they have done so, because they challenge under Section 706(2)(A) of the APA[1] the ROD adopting the Revised Plan and EIS that underlies it.

Plaintiffs correctly state that there is a right of judicial review of "agency actions"

[1]5 U.S.C. Section 706(2) provides in part:
"The reviewing court shall . . .
"(2) hold unlawful and set aside agency action .. . found to be - -
"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."

under Section 702 of the APA.  As set forth above, one of the things that qualifies under Section 551(13) as an agency action is a "rule."  A "rule," in turn, is defined to include "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ."  5 U.S.C. Section 551(4).  Plaintiffs argue that the ROD is a rule under the APA, because it interprets and implements WSRA as applied particularly to the Merced River.  Therefore, Plaintiffs argue, the ROD is an "agency action" under the APA.

Plaintiffs further argue that the ROD is a "final" agency action subject to review under Section 704 of the APA.   Under Bennett v. Spear, 520 U.S. 154, 177 (1997), final agency action exists if:  (1) the action marks the consummation of the agency's decisionmaking process, meaning it is not "merely tentative or interlocutory in nature;" or (2) the action determines rights or obligations, and has legal consequences.  Plaintiffs assert that the ROD satisfies the first Spear criterion because it consummates NPS's decisionmaking related to its duty under WSRA and the Ninth Circuit's order.  They also assert that the EIS upon which the ROD is based consummates NPS's decisionmaking under NEPA to perform its duties to publicly consider and evaluate the environmental consequences of its actions.

Plaintiffs claim that the ROD also satisfies the second criterion in Spear, because it determines rights and obligations and has legal consequences.  For example, the ROD addresses user capacities by determining the limits on the number of people who may use the Merced River corridor in the next five years, and also addresses river boundaries and management zoning in El Portal.  Plaintiffs argue that the ROD has legal consequences, not only because of these two decisions, but also because it immediately authorizes continuing uses of the river corridor.

In regard to SUWA, Plaintiffs contend that the present case is distinguishable because SUWA involved the issue of whether a party could bring a "failure to act" claim challenging an agency's failure to comply with a broad statutory goal that did not require any particular

17

discrete agency action.   In contrast, argue Plaintiffs, they do not seek to compel NPS to perform any tasks for the first time. Rather NPS has already acted, in part because WSRA and the Ninth Circuit compelled it to do so, and Plaintiffs now seek review of the ROD that purports to comply with those mandates.   Plaintiffs argue that their challenges are thus to a final agency action and are subject to review under section 706(2) of the APA.   They also argue that the agency duty at issue in SUWA to "avoid impairment" is not analogous to NPS's affirmative duty under WSRA to address user capacities, particularly as ordered by the Ninth Circuit.   They conclude that NPS's decisions taken in an attempt to comply with WSRA and the order of the Ninth Circuit are  subject to judicial review as final agency actions.

In regard to Veneman, the Ninth Circuit case decided after SUWA, Plaintiffs argue that this again involves a failure to act, which is dissimilar to the present case.  Plaintiffs also argue that in another case decided after SUWA, the Ninth Circuit held that it did have jurisdiction over a forest plan adopted pursuant to the National Forest Management Act, which they claim is analogous to a wild and scenic river management plan.  In Natural Resources Defense Council v. United States Forest Service, 421 F.3d 797, 804 (9th Cir. 2005), Congress had placed a provision in an omnibus appropriations act stating that the ROD for the 2003 SEIS for the 1997 Tongass Land Management Plan was not subject to judicial review.   The government argued that Congress had intended to insulate the entire 1997 plan from judicial scrutiny.  The Ninth Circuit rejected this argument and found that it had jurisdiction under 28 U.S.C. Section 1291 to review the final decision and judgment of the district court dismissing the plaintiff's claims.  The decision contains no reference to SUWA or a lack of jurisdiction under the APA.

Plaintiffs distinguish one final case.  In Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871 (1990), the plaintiffs brought an action suing the Secretary of the Interior over what they characterized as his "land withdrawal review program," which concerned at least 1250

18

actions across 11 western states and the classification of lands which might in the future allow entry for activities such as mining.  The Supreme Court held that the program in question was "not an 'agency action' within the meaning of" the APA.  Id. at 890.   The Court noted that the plaintiffs' complaint "does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations."  Id.

Plaintiffs argue that by contrast, they challenge a specific CMP and EIS that together have immediate effects on a discrete wild and scenic river.  They stress that in Lujan, the Court  explained that, "we intervene in the administration of the laws only when, and to the extent that, a specific "final agency action" has an actual or immediately threatened effect. Toilet Goods Assn., 387 U.S., at 164166, 87 S.Ct., at 1524-1526.  Such an intervention may ultimately have the effect of requiring a regulation, a series of regulations, or even a whole 'program' to be revised by the agency in order to avoid the unlawful result that the court discerns."

In concluding, Plaintiffs note that the Ninth Circuit directed NPS to "adopt specific limits on user capacity consistent with both the WSRA and the instruction of the Secretarial Guidelines that such limits describe an actual level of use that will not adversely impact the Merced's ORVs."  Friends of Yosemite Valley, 348 F.3d at 797.  Plaintiffs claim that Defendants' argument that the 2005 Revised Plan is not a final agency action  implies that it does nothing to change the status quo.  Plaintiffs argue that if this is true, NPS has not complied with the Ninth Circuit's directive.

The court agrees with Defendants that whether Plaintiffs rely on Section 706(1) or 706(2) is immaterial, because, as explained in SUWA, an agency action includes both action and inaction.  See 5 U.S.C. Section 551(13). The court also agrees with Defendants that regardless of under what section a legal challenge is brought, it must concern final agency action.  However, the court must agree with Plaintiffs that the ROD adopting the 2005 Revised Plan is a final agency action.   That is, the court finds that the ROD is an "agency

statement of general or particular applicability and future effect designed to implement [and] interpret. . . law or policy" as to the application of WSRA to the Merced River, and is therefore a "rule" under Section 551(13). Thus, the ROD is an agency action. Further, the court finds that the ROD marks the "consumation of the [NPS'] decisionmaking process" under WSRA and the Ninth Circuit's order and determines rights or obligations, and has legal consequences in that it establishes limits on visitor capacity for the next five years and addresses river boundaries and management zoning in El Portal. Thus, the 2005 ROD is a final agency action subject to judicial review under the APA. 5 U.S.C. Section 702.

Accordingly, the court finds that it continues to have subject matter jurisdiction over this action.

**Defendants' Motion to Strike**

Plaintiffs filed four declarations and several exhibits in conjunction with their motion for summary judgment. Defendants have moved to strike these declarations and their supporting exhibits, contending that they lie outside the scope of the administrative record in this case. Defendants qualify this contention somewhat, stating that they do not seek to strike the portions of the declarations of Bart Brown and Greg Adair to the extent that they are offered solely for the purpose of establishing standing. Because Defendants clarify in their opposition and reply that they do not challenge Plaintiffs' Article III standing, the court has disregarded Mr. Brown's declaration in its entirety and Mr. Adair's declaration to the extent it is offered to establish standing.

It is undisputed that the focal point for judicial review is the administrative record before the agency at the time of the agency's decision and "not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973). There are, however, exceptions to this general rule. In Animal Defense Council v. Hodel, 840 F.2d 1432, 1436 (9th Cir. 1988), the Ninth Circuit explained:

However, certain circumstances may justify expanding review beyond the record or permitting discovery. See, e.g., Public Power Council v. Johnson, 674 F.2d 791, 793 (9th Cir.1982). The district court may inquire outside the administrative record when necessary to explain the agency's action. Id. at 793-94. When such a failure to explain agency action effectively frustrates judicial review, the court may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary." Camp v. Pitts, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The court's inquiry outside the record is limited to determining whether the agency has considered all relevant factors or has explained its course of conduct or grounds of decision. Hintz, 800 F.2d at 829.

The district court may also inquire outside of the administrative record "when it appears the agency has relied on documents or materials not included in the record." Id. In addition, discovery may be permitted if supplementation of the record is necessary to explain technical terms or complex subject matter involved in the agency action. Id.

Defendants claim that the declarations and supporting exhibits at issue here do not fall within one of these exceptions. Plaintiffs oppose Defendants' motion, claiming that the extra-record evidence does qualify for the exceptions.

Plaintiffs explain that they submit the declaration of Greg Adair and the accompanying photographs for authority in addition to the administrative record concerning the adverse impacts and degradation to specific areas of the Park due to the 200 MRP. They state that the declaration offers only what Defendants have already been alerted to through the comments of Plaintiffs and others, as set forth in the administrative record. They stress that the photographs provide a visual illustration of actual conditions in the Park.

Plaintiffs submit the declaration of Bridget McGinniss Kerr to show that the SEIS fails to give the decisionmaker or public an accurate portrayal of the existing resources and their location in relation to what may occur during the zoning design. Plaintiffs claim that Defendants have not revealed the relationship between zoning and cultural and biological resources, and have therefore failed to provide necessary and relevant data.

Finally, Plaintiffs present the declaration of Patrick Rhoan, offering him as an expert competent to testify regarding Native American experiences and cultural resources relied

upon in Yosemite Valley and along the Merced River corridor.   Plaintiffs rely upon Mr. Rhoan's testimony to show the damage caused to traditional cultural resources by development, and along with the testimony of Ms. Kerr, to show that NPS failed to consider a reasonable alternative.  They also argue that the testimony of Mr. Rhoan and Ms. Kerr reveals the extent to which NPS in the SEIS has "swept problems or criticisms under the rug."  National Audubon Soc., 46 F.3d at 1447.

The court has reviewed the extra-record evidence submitted by Plaintiffs and concludes that this evidence is unnecessary for the court's understanding of the issues currently before it.  Therefore, the court has disregarded this evidence for the purposes of the issues resolved in the present opinion.  However, this opinion does not address the injunctive relief sought by Plaintiffs, and the court has not yet determined whether the evidence should be considered by the court in resolving the issue of that relief.  Accordingly, the court declines to strike the evidence at this time.

**New or Revised Plan**

Plaintiffs contend that the 2005 Revised Plan fails to comply with the express requirements of WSRA, as confirmed by the Ninth Circuit's decision, to have one CMP for the Merced River.  Plaintiffs rely on the language from the Ninth Circuit's April 20, 2004 order noting that it had previously "held that the entire Merced Wild and Scenic River Comprehensive Management Plan ("CMP") is invalid" and requiring the NPS to  prepare "a new or revised CMP."

Plaintiffs present two related arguments.  First, Plaintiffs argue that although  NPS captions the new document "Revised Comprehensive Management Plan," it is not comprehensive.  Rather, by its own terms, the 2005  Revised Plan "is intended to supplement and amend the Merced River Plan/FEIS that was completed in June 2000."  Revised Plan, I-25. Plaintiffs complain that, "[t]he Park Service has merely issued supplemental volumes as amendments to the invalid 2000 CMP, expecting this court and the public to probe some

thousands of pages in six volumes of material, with cross-referencing and incorporation, to try and glean what NPS claims is a comprehensive plan." Plaintiffs further claim that the 2005 Revised Plan focuses on user capacity, river area boundaries, and revision of the 1980 General Management Plan, Revised Plan, I -6, and makes only cursory mention of such elements as outstandingly remarkable values, management zones and river protection overlay, referring the reader instead to the 2000 MRP.   Revised Plan, I -13, I - 17 ("refer to the Merced River Plan/FEIS for a more detailed description of the River Protection Overlay and its specific prescriptions"); II - 16 (explaining that "[m]anagement zoning for the Merced River corridor was "adopted by the 2000 Merced River Plan" and referring the reader to pages 57 -101 of the summary document completed in February 2001); II -30 ("[a] detailed discussion of the relationship between specific management zones and the river's Outstanding Remarkable Values can be found in the Merced River Plan (NPS 2001a)"). Plaintiffs conclude that because the 2005 Revised Plan relies on the 2000 MRP, it must be rejected as "not in compliance with WSRA as interpreted by judicial orders in this case." While Plaintiffs do not dispute NPS's ability to use information and appropriate analyses from the 2000 MRP in a new or revised plan, they argue that NPS is required to issue a single CMP that contains all management decisions and environmental analyses.

Second, Plaintiffs contend that reliance on the 2000 MRP is improper not only because the 2005 Revised Plan is therefore not comprehensive, but also because the 2000 MRP has been held to be invalid.  Thus, Plaintiffs argue, while the ROD for the 2005 Revised Plan expressly states that it "will amend the existing 2000 Merced River Plan," there is no "existing" 2000 Merced River Plan.   Essentially, Plaintiffs argue that any reference to, or reliance on, the 2000 MRP  as a separate, free-standing entity apart from the 2005 Revised Plan is improper, because that plan has been held to be invalid by the Ninth Circuit.

In response, Defendants contend that the 2005 Revised Plan constitutes a properly

approved revised CMP.  They restate Plaintiffs' argument as follows: "plaintiffs claim that it was improper for the defendants to reincorporate management elements and data from the 2000 Plan into the Revised Plan."  Defendants then argue that Plaintiffs' counsel disavowed this position at the October 24, 2005 hearing and conclude that Plaintiffs therefore cannot now claim that it was improper for NPS to reuse data and management elements from the 2000 Plan.

After review of the papers and after hearing the oral arguments of the parties, the court finds that Defendants' argument does not accurately reflect Plaintiffs' position.  Plaintiffs do not contend that it was improper for Defendants to reincorporate management elements and data from the 2000 MRP  into the 2005 Revised Plan.  They do not contend that the NPS must come upon with a new plan that reexamines all of the elements of  WSRA, without using any elements of the 2000 MRP.  What Plaintiffs contend is that Defendants may not rely on the 2000 MRP as a separate, existing plan in addition to the 2005 Revised Plan.  They argue that the 2005 Revised Plan must be  wholly self-contained and that because the 2000 MRP has been declared invalid, the 2005 Revised Plan cannot refer the reader to it as an ongoing plan. Plaintiffs contend that NPS is required to issue a <u>single</u> CMP that contains all management decisions and environmental analyses.

The court and the parties find themselves at the present juncture because of the need to interpret the Ninth Circuit's opinion issued October 27, 2003, and the clarifying order issued April 20, 2004.   On remand from the appeal, this court stated in part as follows:

> As explained above, the Ninth Circuit reversed this court's March 22, 2002 opinion on two issues only, finding that the MRP violated WSRA by insufficiently addressing user capacity and by improperly drawing the river boundaries within El Portal.  The Ninth Circuit otherwise upheld the MRP and EIS on the points on which Plaintiffs challenged it.  After reviewing Plaintiffs' arguments in depth, this court finds that Plaintiffs have failed to establish that the Ninth Circuit's opinion invalidates the existing MRP.  Although not determinative, the court finds evidence to support this finding in the express language of the Ninth Circuit that "[w]e remand for the district court to enter an appropriate order requiring the NPS to *remedy these deficiencies in the CMP* in a timely manner."  <u>Friends of Yosemite</u>, 348 F.3d at 803 [emphasis added.] Thus, the court rejects Plaintiffs' argument that the Ninth Circuit's

opinion requires this court to enjoin all pending projects which are dependent upon
the Valley Plan, which is in turn dependant upon the MRP.

Memorandum Opinion and Order Following Remand, 28.

On April 20, 2004, the Ninth Circuit issued an order stating as follows:

We write to clarify our Opinion of October 27, 2003, *Friends of Yosemite Valley v.
Norton,* 348 F.3d 789, 796-99 (9th Cir.2003). There we held that the entire Merced
Wild and Scenic River Comprehensive Management Plan ("CMP") is invalid due to
two deficiencies: (1) a failure to adequately address user capacities; and (2) the
improper drawing of the Merced River's boundaries at El Portal. While we remanded
to "the district court to enter an appropriate order requiring the [National Park
Service] to remedy these deficiencies in the CMP in a timely manner," *id.* at 803, we
did not "otherwise uphold the [CMP]." District Court's Memorandum Opinion and
Order Following Remand at 28. Rather, our Opinion merely stated that the additional
challenges to the CMP brought by Friends of Yosemite Valley and Mariposans for
Environmentally Responsible Growth (collectively, "Friends") lacked merit. Pursuant
to our original Opinion, the National Park Service ("NPS") must prepare a new or
revised CMP that adequately addresses user capacities and properly draws the river
boundaries at El Portal.
Because the district court based its denial of Friends' motion for injunctive relief on a
misconstruction of our Opinion, we remand this matter to it for reconsideration of
Friends' motion in light of this clarification of our prior holding. Pending the district
court's reconsideration of this matter, we grant a temporary stay of proceedings and an
injunction prohibiting NPS from implementing any and all projects developed in
reliance upon the invalid CMP.
IT IS SO ORDERED.

Friends of Yosemite Valley v. Norton, 366 F.3d 731 (9th Cir. 2004).

Thus, in its clarifying order, the Ninth Circuit stated that its opinion found the "entire"
2000 MRP was "invalid" due to the two deficiencies and that its opinion did not "otherwise
uphold the [CMP]." This court finds that Plaintiffs are correct in arguing that because the
Ninth Circuit found the 2000 MRP to be invalid, the 2005 Revised Plan cannot logically refer
to it and rely on it, as a separate, existing entity, to create a "new or revised" plan.

As Plaintiffs' counsel stated, there is nothing wrong with Defendants using parts
(even very large parts) from the 2000 MRP to create a whole new or revised plan. But that is
not what Defendants have done. Defendants have proceeded from the assumption that the
2000 MRP still exists. For example, the ROD for the 2005 Revised Plan states that it "will

25

amend the existing 2000 Merced River Plan to address the two deficiencies identified by the

Ninth Circuit Court of Appeals." ROD - 3.   It also provides:

> When teamed with the other plan elements, the revised User Capacity Management Program and the revised El Portal boundary work synergistically.  Because the newly revised elements of the plan can and do function with the pre-existing elements in a comprehensive manner, the remaining management elements as described in the 2000 Merced River Plan/FEIS have not been revisited in this plan.

ROD - 3. Perhaps most telling of all is the following statement from the Executive Summary

to the Revised Plan set forth at AR 4837:

> In response to the Court's direction, the National Park Service is preparing the *Merced Wild and Scenic River Revised Comprehensive Management Plan and Supplemental Environmental Impact Statement* (hereinafter referred to as the Revised Merced River Plan/SEIS).  This revised plan will amend the existing Merced River Plan to address the two deficiencies identified by the Court and to specify how it amends the *General Management Plan*.  This Revised Merced River Plan does not replace the Merced River Plan adopted in 2000, but corrects the deficiencies in its management elements.

This approach by NPS corresponds to how this court originally perceived the posture

of the case when it was remanded by Ninth Circuit.  However, the Ninth Circuit's order

clarifying its opinion explained that it held the 2000 MRP plan to be invalid.  NPS was not

given the discretion to remedy the deficiencies in the 2000 MRP as it saw fit.  It was given

specific directions by the Ninth Circuit in its Opinion and in its subsequent order clarifying

that opinion.  This court finds that language from the Ninth Circuit indicates an intention that

a single document be produced, covering everything.  This court further finds that NPS's

approach, as set forth in the above-quoted language from the 2005 Revised Plan and ROD,

does not comply with the Ninth Circuit's directions.[2]

_____

[2]When asked at oral argument what volumes contained the entire Revised Comprehensive Management Plan without reference to any other document, counsel for Defendants stated that the entire 2005 Revised Plan could be found in the one-volume "Presentation Plan."  In response, Plaintiffs' counsel argued that the court should not look at that document.  She explained that Plaintiffs challenge the July 2005 Record of Decision, which implemented the 2005 Revised Plan.  The Presentation Plan, however, was not prepared until December 2005, after the present

Accordingly, the court finds that Plaintiffs are entitled to summary judgment on their

claim that NPS has violated WSRA by failing to adopt a single, self-contained

comprehensive management plan for the Merced River.[3]  The 2005 Revised Plan is therefore

invalid.

**User Capacity**

As set forth above, the Ninth Circuit found that the 2000 MRP violated WSRA by

insufficiently addressing user capacities.  In analyzing Section 1274(d)(10), the WSRA

section which requires the adoption of a comprehensive management plan or CMP, the Ninth

Circuit held:

> we interpret § 1274(d)(1)'s instruction that a CMP must "address .   .   . user
> capacities" to require only that the CMP contain specific measurable limits on use.
> [Citations omitted.]

> This does not mean that the NPS is precluded from using the VERP to fulfill the user
> capacities requirement.  However, the WSRA does require that the VERP be
> implemented through the adoption of quantitative measures sufficient to ensure its
> effectiveness as a current measure of user capacities.

---

complaint was filed in this case.  The Presentation Plan therefore did not go through the NEPA
process and was not presented to the public.  Defense Counsel replied that Defendants felt that it
was important to include the Presentation Plan as part of the record, because it provides an
"undated summary reflecting what's in the record of decision."  They stated that it is currently
being printed and copies will be mailed to the public.   Because the Presentation Plan was not
presented for public review as the Revised Comprehensive Management Plan, this court cannot
view it as such.

The court notes that the Abstract of the Merced Wild and Scenic River Revised
Comprehensive Management Plan and Supplemental Environmental Impact Statement, found as
the second page of the grey, two - volume set, begins, "[t]his document is the *Final Merced Wild
and Scenic River Revised Comprehensive Management Plan and Supplemental Environmental
Impact Statement* (Final Revised Merced River Plan/SEIS).  It is that two-volume document the
court has referenced as the 2005 Revised Plan.

[3]Because the court has found the entire 2005 Revised Plan to be invalid, it can be argued
that the other claims raised by the parties are moot.  However, for the sake of the expedient
resolution of this case, the court will address the other major claims.  The court  declines to
address issues not covered by the two-volume 2005 Revised Plan, and covered only by the
invalid 2000 MRP.

Friends of Yosemite Valley, 348 F.3d at 797.

Defendants contend that they are entitled to summary judgment on the issue of addressing user capacities, because the user capacity program in the 2005 Revised Plan meets this requirement.  They argue that the program relies on Visitor Experience and Resource Protection ("VERP") framework,[4] but also relies on a number of other methods for addressing user capacity, some of which set limits on the number of people allowed in the river corridor.  They argue that these methods, taken together, "function as a suite of specific, measurable limits" through which NPS  will "regulate visitor use" to ensure the protection and enhancement of the Merced River's ORVs.  Defendants group the methods employed to address user capacity into the following six categories: limits on the number of people; limits on facilities; limits on specific activities; limits based on environmental and experiential conditions; and interim limits on facilities and specific activities.

In regard to limits on people, Defendants explain that the Wilderness Trailhead Quota System, which has been in place since the 1970s, assigns a daily quota of visitors for each wilderness trailhead and thus allows the park to regulate and disperse visitor use in the wilderness areas surrounding the river.  See AR 6802.  Defendants claim that this system has enabled NPS to protect natural and cultural resources in the wilderness and to ensure a quality wilderness experience for park visitors by maintaining low levels of visitor use.  Defendants assert that because approximately 63% of river corridor is composed of wilderness, the Wilderness Trailhead Quota System imposes specific, measurable limits on over half of the NPS-administered portion of the Merced River corridor.

Defendants also explain that the Superintendent's Compendium includes a number of specific, measurable limits on visitor use.  This includes limits on overnight group size, day use group size, stock animals per group, stock travel areas, areas of non-motorized water craft

---

[4]The VERP framework is described in detail in the Ninth Circuit's opinion.  Friends of Yosemite Valley, 348 F.3d at 796 -97.

use, and areas of fishing.   Finally, Defendants explain that visitor use is limited by existing facilities capacities, specifically that of the park's two wastewater facilities.

Defendants next claim that two programs within the 2005 Revised Plan fall within limits based on environmental and experiential conditions: the Wilderness Impact Monitoring System and VERP. The Wilderness Impact Monitoring System ("WIMS") was developed in the 1970s for wilderness managers to scientifically monitor the effectiveness of the Wilderness Trailhead Quotas.  Under WIMS, park scientists conduct inventory and monitoring studies to gather data on wilderness trail and campsite impacts. This data has been used to evaluate whether changes are occurring to wilderness resources and to make adjustments in the trailhead quotas needed to protect wilderness resources and the quality of wilderness experience.

In referring to the Wilderness Trailhead Quota System, the Superintendent's Compendium, limitations based on facilities capacities and WIMS, Defendants do not dispute that the VERP program is NPS's primary user capacity management tool.  See Revised Plan, II - 11 ("Although the VERP framework was identified as the National Park Service's primary user capacity management tool in the 2000 Merced River Plan, the remaining steps in the process had not been completed at the time of the Ninth Circuit Court of Appeals' October 2003 decision.  This Revised Merced River Plan/SEIS proposes a fully developed VERP program for Yosemite National Park.").   The additional methods for addressing user capacity discussed above predate the 2000 MRP and were relied upon by Defendants in support of that plan.  Despite their existence, the Ninth Circuit found that the defects in the VERP program caused the 2000 MRP to be "deficient in its approach to user capacities."  Id. at 796. Accordingly, this court cannot find these additional methods persuasive as to whether the 2005 Revised Plan adequately addresses user capacities.  As was the case before the Ninth Circuit, the focus of this court's inquiry into user capacity remains the VERP program.

Defendants claim that VERP program is a scientifically-based monitoring and

management program that relies on specific, measurable limits.  Defendants summarize the VERP program as follows: "VERP addresses user capacity by adopting desired resource conditions which are translated into quantitative and measurable indicators and standards.  These indicators are then monitored to ensure that the established standards are being met.  If standards were to decline or fall below established levels, the park would take management action to rectify the condition and return conditions to the established standard."

Defendants state that because NPS recognized that the VERP program would take "several field seasons" to become "fully operational" it has adopted the Ninth Circuit's recommendation to incorporate "preliminary or temporary limits of some kind" into the user capacity program.   Thus, although the 2005 Revised Plan states claims that it "implements a fully developed VERP program," 2005 Revised Plan, II - 11, NPS anticipates needing five more years to "refine" the VERP.[5]  NPS has therefore adopted interim limits which apply in each segment of the river, and act as caps on the levels and types of use in the river corridor.  The 2005 Revised Plan provides that:

> The interim limits will last for approximately five years, while the VERP indicators and standards continue to be field tested and improved.  The National Park Service would evaluate the VERP program's effectiveness in providing management with the information need to manage visitor use in a manner that protects and enhances the Outstandingly Remarkable Values.  Based on this evaluation, park managers would present a report to the public addressing whether the VERP program has provided the required guidance on visitor use levels and whether facility limits should be continued, modified or eliminated.  If the VERP program is providing sufficient data on visitor use to guide the protection of Outstandingly Remarkable Values, interim limits would most likely be eliminated.  If, however ,the VERP program is not providing sufficient data, the National Park Service would continue interim limits until VERP is functioning as intended.   In this situation, interim limits would not be eliminated; however, the National Park Service could consider revisions to the interim limits (*e.g.*, adding new limits, revising limits).

---

[5]How NPS reached the decision to implement the interim measures for a period of five years is not meaningfully  addressed in Defendants' papers.  When asked at oral argument why this particular time period was selected, Defendants' counsel stated that he couldn't give a definitive answer, but thought that it was chosen because it seemed like a reasonable period to have time to collect the data, apply the standards, see if the standards are working, and make needed adjustments.

2005 Revised Plan, III-20.

The interim limits restrict the number of lodging rooms, day visitor parking spaces, bus parking spaces, tour buses, employee bed spaces, and campsites.   In particular, the number of lodging rooms, day visitor parking places, and bus parking spaces are set at existing levels.  Campground spaces in Yosemite Valley are allowed to increase by 163 sites, which Defendants assert is below the number of campsites that existed in Yosemite Valley before the 1997 flood.  Buses are limited to 92 buses per day, which Defendants claim is consistent with the number of buses that entered the Valley during the mid-1990s.  Revised Plan, III - 20 -22.

Plaintiffs contend that the 2005 Revised Plan fails to adequately address user capacity, and that they are entitled to judgment on this issue.  Plaintiffs rely on language from the Ninth Circuit's opinion stating that NPS "shall adopt specific limits on user capacity consistent with both the WSRA and the instruction of the Secretarial Guidelines that such limits describe an actual level of use that will not adversely impact the Merced ORVs," Friends, 348 F.3d at 797, claiming that Defendants did not comply with this order.

Plaintiffs contend that the user capacity program established by NPS in the 2005 Revised Plan violates WSRA and the Ninth Circuit's order in four ways.  First, Plaintiffs contend that the interim facility limits merely allow the *status quo* to act as the Merced River's user capacity and those limits are not linked to protecting ORVs.   Plaintiffs argue that NPS's interim facility limits based on current and planned facility capacity for the Park proceed from the false assumption that the status quo has no impact on Merced River ORVs.  They claim that the 2005 Revised Plan does not provide any analysis of how actual visitor use, based on maximum facility capacity, protects the ORVs for the Merced River.

Second, Plaintiffs argue that NPS' decisions violate WSRA and the Ninth Circuit's order because VERP, the main user capacity mechanism, does not state an actual specific and measurable level of visitor use that will not adversely impact the Merced's ORVs.  Plaintiffs

31

note that in its standards and indicators, the VERP program does provide standards by which to measure for desired conditions. However, these are not quantitative measures of actual visitor use.

Third, Plaintiffs argue that the VERP program's standards and indicators do not adequately address ORVs. That is, they claim that even if the VERP program's indicators and standards did state an actual level of visitor use, they are not adequately linked to scientific, biological, hydrological and cultural ORVs, because they are based on the desired conditions of management zoning. Plaintiffs claim that most of the VERP program's indicators are tied to social conditions and experiences and will not protect the river's non-recreational ORVs. These indicators are set forth in Table II-5. Plaintiffs argue that these indicators are presented without any real explanation of how they may prevent degradation or enhance specific resources that make up the ORVs.

Relatedly, Plaintiffs assert that management zoning is not linked to the location or condition of ORVs. As Plaintiffs note, the VERP program has a tiered approach, which first requires detailed mapping of sensitive resources, then management zoning based on those maps, and finally indicators and standards based upon the management zoning. Management zoning defines qualitative desired conditions for areas within the Merced River corridor and dictates how heavily an area will be used or developed. Plaintiffs complain that the 2005 Revised Plan does not address zoning for any part of the Merced River corridor other than El Portal, but instead relies on the zoning in the invalid 2000 MRP. Plaintiffs claim that this zoning was not properly developed based on resource concerns and sensitive resources. Finally, in addition to claiming that the VERP program's standards and indicators do not adequately address ORVs, Plaintiffs claim that they do not protect ORVs. They argue that many indicators do not have any baseline data to support developing quantitative standards, noting in particular that the Chief of Yosemite's Resources Management and Science has indicated that the sole indicator and standard for cultural resources is not protective of that

ORV. AR 7888. They argue that because most levels of impact to cultural resources are unacceptable, the VERP program does not effectively address that ORV.

Fourth, Plaintiffs argue that even if the VERP program's indicators and standards were adequately linked to ORVs, they do not prevent adverse impacts. Instead, they allow for monitoring, which provides information that adverse impacts have occurred and that some management action may be taken. Plaintiffs further note correctly that in the 2005 Revised Plan, NPS does not commit to take any particular management action once degradation has occurred. They stress that even under the 2005 Revised Plan, the VERP program still has no mechanism for setting an actual level of use that will prevent degradation.

The Ninth Circuit held: "[o]n remand, the NPS shall adopt specific limits on user capacity . . . that such limits describe an actual level of visitor use that will not adversely impact the Merced's ORVs." Friends of Yosemite Valley, 348 F.3d at 797. After examining all of the parties' arguments and the administrative record, this court finds that NPS has failed to comply with this order. What NPS has done, some sixteen years after it was required to create a comprehensive management plan for the Merced River, is to decide that for approximately five years, it would like to experiment with implementing the VERP program as its primary means of addressing user capacity. Remarkably, NPS makes no commitment to the use of the VERP program after five years, stating that "whether VERP will become permanent after five years is not known at this time." Defendants' Response to Plaintiffs' Concise Statement of Facts, response to no. 15 at p. 5.[6] Thus, in theoretically crafting a plan for addressing user capacity, NPS has left itself the option of deciding in five years to abandon its currently proposed method and proceed in an entirely different, as yet unidentified, manner. Under this scenario, there is no indication when, if ever, NPS will

---

[6]The uncertainty of this issue is demonstrated by Defense Counsel's explanation at oral argument that, "VERP does not necessarily end at the end of five years. VERP may go on considerably longer and certain parts of it may go on in the interminable future."

finally adopt a permanent primary method for addressing user capacity, a required component

for a comprehensive management plan under WSRA.[7]

NPS' implementation of the interim limits within the VERP program  was an express

attempt to comply with the order to adopt specific limits on user capacity by following the

Ninth Circuit's suggestion regarding implementation of preliminary or temporary limits.

These "limits," however, are simply the current physical capacity of the facilities in Yosemite

Valley, resulting from the ebb and flow of  facility availability over time.  Further, the court

notes that NPS has acknowledged a significant error in the description of the interim facility

limits in the two-volume Revised Comprehensive Management Plan and Supplemental

Environmental Impact Statement.   In the ROD, NPS explains:

> [T]he National Park Service has also made a technical correction on page III-20 of the
> Revised Merced River Plan/SEIS.  In the fourth paragraph, the Revised Merced River
> Plan/SEIS states, "The interim facility limits would restrict any changes to the current
> facility footprint and would require the National Park Service to manage use
> accordingly."  This statement is not correct.  Interim facility limits do not constrain
> park facilities to the current footprint.

ROD -9.   Thus, contrary to the impression that was given by the Revised Merced River

Plan/SEIS that was presented for public review, under the interim limits, new construction

may occur outside of existing developed spaces.

Defendants assert that the Administrative Record demonstrates that most interim

facility limits are set below the facility levels that existed in 1980, before the river was

designated under WSRA.  They argue that, if the status of the river's ORV's was sufficient for

eligibility in 1987 when Yosemite Valley had many more parking spaces, campsites, and

lodging room than it does now, Plaintiffs cannot argue that the currently lower facility levels

---

[7]This situation provides even less certainty than the 2000 MRP, in regard to which the
Ninth Circuit noted that, "the NPS's proposed five-year timetable for the implementation of the
VERP framework would not satisfy § 1274(d)(1)'s three-full-fiscal-year timetable even if the
NPS were to have begun implementation of the VERP immediately upon Congress' designation
of the Merced." Friends of Yosemite Valley, 348 F.3d at 797.

are degrading ORVs.  The court rejects this argument.  Defendants have provided no authority for the presumption that facility levels in existence at the time that the Merced River was designated under the Wild and Scenic River Act are protective of the ORVs, or, as Plaintiffs argue, that such levels are otherwise grandfathered in.  Defendants have pointed to nothing in WSRA which provides that maintaining facility levels that existed at the time a river is designated under WSRA satisfies the user capacity component of the required comprehensive management plan.  The court finds, therefore,  that the interim limits are defective for the same reason that the Ninth Circuit found the 2000 MRP to be invalid: they do not describe an actual level of visitor use that will not adversely impact the Merced's ORVs.

As Plaintiffs repeatedly and correctly argue, the VERP program in the 2005 Revised Plan is reactive.  Defendants consistently sidestep the fact that  without a user capacity program that states an actual level of visitor use that will not adversely impact ORVs, the VERP program is a reactionary tool to try to stop degradation that has already occurred.  The requirement for specific measurable limits on use is to <u>prevent</u> degradation, not to respond after it has happened.  The court finds that the VERP program, the primary user capacity program in the 2005 Revised Plan, does not contain such specific measurable limits on use, and so is not oriented towards  preventing degradation.

What NPS has created in the VERP portion of the user capacity program in the 2005 Revised Plan is a tentative plan of uncertain duration which adopts temporary limits, which will apply for an unknown length of  time.  Defendants provide no authority for the concept that such an arrangement can constitute an approach to user capacity that is valid under WSRA.

For all of the above reasons, the court concludes that the VERP program in the 2005 Revised Plan  is inadequate to constitute the primary feature of a user capacity program that must "describe an actual level of visitor use that will not adversely impact the Merced's ORVs."  This court finds, therefore, that Plaintiffs are entitled to summary judgment on their

claim that Defendants have abused their discretion by failing to adopt a user capacity program in compliance with WSRA and the order of the Ninth Circuit.

**El Portal Boundaries**

The Ninth Circuit found that [t]he NPS violated the WSRA by drawing the boundaries at the Merced's El Portal administrative site too narrowly." Friends of Yosemite Valley, 348 F.3d at 797.  The court defined the burden on NPS in regard to the designation of boundaries under WSRA as follows: "Boundaries set within the WSRA's acreage requirement, regardless of where such boundaries fall within the statutory range, must be drawn so as to protect and enhance the ORVs causing that area to be included within the WSRS." Id. at 799.

In regard to the El Portal boundaries, Defendants explain that they have redrawn the boundaries for the El Portal segment of the Merced River to one-quarter mile on each side of the river, the maximum allowed by WSRA.  Defendants claim that the expanded boundary was based upon mapping of the ORVs,  wetlands mapping, and vegetation mapping, and cultural landscape evaluation.

In response, Plaintiffs contend that because of management zoning, the new El Portal boundaries do not protect and enhance ORVs.   Specifically, Plaintiffs contend that the management zoning for the El Portal segment established in the 2005 Revised Plan is not based on available scientific data about the location of the ORVs.

A large portion of the El Portal segment is zoned as 2C or 3C, and Plaintiffs argue that the very definition of these zones belies the contention that they will protect sensitive ORVs. Category 3C zoning is  described as "Park Operations and Administration" and allows impacts and development for those purposes.  AR 18179; 2005 Revised Plan, II-29 (3C areas "managed with high tolerance for resource impacts in localized areas").   2C zoning is for day use and "is intended to be applied to popular park destinations, where visitors could spend significant periods of time enjoying park resources in a relatively accessible setting."  AR

18097.  Plaintiffs argue that there is no explanation, grounded in sound data or science, of how the ORVs will be protected or enhanced within this scheme of zoning.

In regard to biological ORVs, Plaintiffs claim that NPS has zoned as 3C many areas within the river boundary which contain sensitive biological ORVs.  These include sensitive and rare plant species, and animal species.  Plaintiffs also claim that there are at least two wetlands that are zoned 3C in El Portal and argue that the possible loss or degradation of these wetlands resulting from this zoning will contribute to the already considerable loss of wetlands along the Merced River.  Plaintiffs further claim that 3C zoning will adversely affect oak woodland habitat and species which use that habitat.

Plaintiffs contend that cultural ORVs will be adversely affected by the management zoning within the new El Portal boundaries.  These are generally archeological sites related to native Americans.  They claim that the 2005 Revised Plan does not account for past degradation to cultural ORVs in El Portal and fails to explain with supporting evidence how they will be enhanced and protected from further degradation.  Rather, they argue, most cultural resources are zoned 3C, which will allow for more degradation.

Finally, Plaintiffs dispute Defendants' claim that the hydrologic ORV is not affected by management zoning or boundary decisions.  Plaintiffs argue that the Merced River's natural hydrologic processes have been and will continue to be affected by NPS actions directly allowed in the 2005 Revised Plan.  Specifically, Plaintiffs claim that a great deal of riprap revetment currently restricts the free flow of the Merced River in the El Portal segment and the 2005 Revised Plan allows still more, so as to protect new infrastructure.  They assert that riparian habitat and its associated ORV species are dependent on beneficial effects of natural seasonal flooding.

In response, Defendants make two arguments.  First, they assert that the ORVs of concern to Plaintiffs will be protected regardless of the type of management zone in which they are found.  2005 Revised Plan, V-221 ("[t]he National Park Service would be required to

protect and enhance ORVs in this segment in accordance with the Wild and Scenic Rivers Act in future planning efforts"). They explain that information will be gathered through the VERP process and that no action will be taken without planning consistent with the management elements and criteria development in the 2005 Revised Plan. The 2005 ROD provides in part as follows:

> It should be noted that not all of the areas within the river corridor that are zoned for Park Operations and Administration (3C) would be developed to the maximum capacity allowed under this zoning designation, and some open spaces would continue to exist in this zone. Any proposed future development in 3 C zones would follow a prudent planning process and would be consistent with the other management elements and criteria adopted in the Merced River Plan, as amended, as well as the requirements of the Wild and Scenic Rivers Act.

AR 6575, ROD at 8.

Second, Defendants address the separate ORVs discussed by Plaintiffs, and argue that they examined extensive information regarding each of these ORVs when developing the management zones for the El Portal segment. Defendants provide numerous citations to portions of the administrative record which provide information regarding ORVs. In response, Plaintiffs argue that Defendants' citations to the documents in the record are unpersuasive, because Defendants provide no explanation of how those documents were used or relied upon in developing the management zoning.

As Plaintiffs note, the 2005 Revised Plan provides that, "[the relationship between the revised zoning for the El Portal segment and Outstandingly Remarkable Values is provided in Chapter III, Alternatives in this document." Revised Plan, 11-30. Plaintiffs argue that Chapter III does not provide any explanation of the relationship between the location of ORVs and management zoning. Page III -26 does contain a discussion of the relationship between ORVs in general and the management zoning.[8] It does not, however, provide a discussion of

---

[8] It provides as follows:
The Outstandingly Remarkable Values identified within the El Portal segment of the river corridor include: scientific, geologic process/conditions, recreation, biological, cultural,

how the <u>location</u> of particular ORVs influenced the management zoning imposed by the 2005 Revised Plan.

The court agrees with Plaintiffs that there is little meaningful explanation in the 2005 Revised Plan as to how the management zoning in the El Portal segment of the River was influenced by the location of particular ORVs. The court finds, however, this must be considered in light of the fact that the 2005 Revised Plan expands the boundary at the El Portal administrative site to the maximum allowed under WSRA. Thus, the boundary itself encompasses, and therefore protects, as large an area as possible. Further, NPS has repeatedly acknowledged its duty to protect ORVs regardless of the management zoning imposed. For example, in discussing the environmental consequences of Alternative 2, the 2005 Revised

hydrologic processes. The scientific Outstandingly Remarkable Values, though not directly enhanced by the boundary and management zoning prescriptions under Alternative 2, would be enhanced by information gained through the VERP program, as a comprehensive monitoring program of indicators and standards is a component of this alternative. As mentioned in Alternative 1, both the geologic process/conditions and the hydrologic processes Outstandingly Remarkable Values are not sensitive to the boundary and management zones prescriptions proposed in Alternative 2. The recreation Outstandingly Remarkable Values within the El Portal segment are protected under Alternative 2, as the location of these Outstandingly Remarkable Values are primarily found within the River Protection Overlay and contains both Open Space (2A) and Day Use (2C) Zoning. The extent of the biological Outstandingly Remarkable Values found within a quarter-mile of the river corridor are protected under Alternative 2 through Open Space (2A), Day Use (2C), and Park Operations and Administration (3C) zoning. Similarly, the extent of cultural Outstandingly Remarkable Values within a quarter-mile of the river corridor are protected primarily through Open Space (2A) and Park Operations and Administration (3C) zoning, and most notably through Day Use (2C) zoning.

The proposed management zoning scheme fulfills the legislative intent of the Wild and Scenic Rivers Act. A subsidiary consideration is the legislative intent for the El Portal Administrative Site, which was transferred to the National Park Service to be used for operational purposes and to allow for the relocation of many park administrative and support facilities from Yosemite Valley to El Portal. Outstandingly Remarkable Values would be protected and enhanced during site planning and development within all management zones. Protection of the Outstandingly Remarkable Values would be further evaluated and documented in the El Portal Concept Plan, which will be initiated following completion of this Revised Merced River Plan/SEIS. The El Portal Concept Plan would re-evaluate the development proposed in the *Yosemite Valley Plan* for El Portal, in light of the revised river corridor boundary and management zoning in the El Portal area.

Plan expressly states that, "[a]ll ORVs must be protected on a segment-wide basis regardless of the zoning designation or whether the resources are in or outside of the river corridor boundary." 2005 Revised Plan, V -180.  Further, as Defendants explain,  the 2005 Revised Plan is a programmatic plan  which does not authorize any specific development. 2005 Revised Plan, I -7 - 9.  Any actual development in the El Portal segment would occur only after site-specific planning for individual projects, which would include the protection of ORVs.  2005 Revised Plan, 1 -24; III - 26. Defendants have provided extensive citations to the administrative record regarding information NPS has gathered regarding the ORVs in the El Portal segment, which is clearly applicable to such future planning efforts.

This court cannot accept the extremely broad principle that NPS' duty to protect and enhance the ORVs of the Merced River results in a prohibition against all development in areas that contain biological, cultural or hydrologic ORVs.  The same duty to protect and enhance the ORVs exists regardless of the management zoning in which they fall, thus the mere designation of an area as a particular zone does not impact ORVs.  Such impact can only occur through actual projects undertaken within the zone, which could not proceed without NPS first complying with WSRA and NEPA.  For these reasons, the court finds that NPS has complied with the requirement that the boundaries be drawn so as to protect and enhance the ORVs, and did not act in an arbitrary or capricious manner in setting the boundaries for the El Portal administrative site in the 2005 Revised Plan, based upon the management zoning imposed.  Defendants are entitled to summary adjudication on this issue.

**General Management Plan**

Plaintiffs contend in their second cause of action that Defendants have violated WSRA by failing to amend the General Management Plan for the Park to be consistent with a valid CMP.  See 16 U.S.C. § 1274(a)(62)(A) ("Such revisions to the general management plan for the park shall assure that no development or use of park lands shall be undertaken that is inconsistent with the designation of such river segments.").  This contention stems from

Plaintiffs' main contention that the 2005 Revised Plan is invalid.

Defendants contend that they have revised the 1980 General Management Plan to insure its consistency with the substantive provisions of the Merced River Plan.  They state that they have also removed any uncertainty as to the relationship between the two plans, because the ROD for the 2005 Revised Plan expressly states that in the event of a conflict between the two plans, the Merced River Plan will control.

Because the court has found Plaintiffs' substantive claims regarding the 2005 Revised Plan to be meritorious, it must also find that Defendants have not amended the General Management Plan for the Park to be consistent with a valid CMP.  Plaintiffs are entitled to summary adjudication on this issue.

**NEPA**

NPS issued an Environmental Impact Statement ("EIS")  for the 2000 Merced River Plan, and this court upheld the EIS, rejecting all of Plaintiffs' NEPA claims.  The Ninth Circuit affirmed this outcome on appeal.  Friends of Yosemite Valley, 348 F.3d at 800 - 801. Pursuant to this court's order on remand, NPS has prepared a supplemental EIS ("SEIS") that includes potential impacts of the decisions in the 2005 Revised Plan regarding user capacity and the El Portal river boundary.  Plaintiffs now claim that the SEIS violates  NEPA for three reasons: 1) there is no true "no action" alternative; 2) it lacks a required reasonable range of alternatives; and 3) it does not use high quality and accurate scientific analysis in developing or evaluating the impacts of the alternatives.

In regard to their first claim that there is no true "no action" alternative, Plaintiffs contend that the no action alternative improperly relies on the invalid 2000 MRP.   Plaintiffs argue that in terms of management direction in place at the time NPS prepared the 2005 Revised Plan, the no action alternative should have included the 1980 GMP, but should not have included either the 2000 Merced River Plan, which the Ninth Circuit held was illegal, or the Yosemite Valley Plan, which they claim relied upon the 2000 MRP.  Plaintiffs claim that

the invalid 2000 MRP gave the green light to all of the development outlined in the Yosemite Valley Plan, thereby illegally predetermining user capacity.  Thus, Plaintiffs conclude, in order to fairly and properly evaluate alternatives to user capacity, those pre-determinations cannot act as the baseline.

Plaintiffs also argue that in assessing the baseline status of the ORVs for the no action alternative, the 2005 Revised Plan should have taken into account all of the individual and cumulative effects from projects NPS has conducted in the last five years.  They claim that NPS had a duty to bring forward relevant information about current Merced River conditions and the status of the resources and ORVs.  Although Defendants argue in response that the Yosemite Valley Plan projects that have been implemented are part of the environmental baseline for no action purposes, Plaintiffs claim that the no action alternative does not collectively discuss the impacts of past, present and reasonably foreseeable future projects in combination with the proposed action.

Defendants contend that in drafting the no action alternative, they relied on the regulations implementing NEPA, which provide in part as follows regarding a situation where an agency seeks to update a land management plan and where ongoing programs implemented by the agency will continue:

> in these cases, 'no action' is 'no change' from current management direction or level of management intensity.  To construct an alternative based on no management at all would be a useless academic exercise.  Therefore, the 'no action' alternative may be thought of in terms of continuing with the present course of action until that action is changed.

46 Fed.Reg. 18026 - 18027 (March 23, 1981).  Defendants explain that the no action alternative for the 2005 Revised Plan is based on the 1980 General Management Plan and other existing park plans and guidelines, such as those for wilderness management, fire

1    management, vegetation management, etc.   They argue that the no action alternative also

2    includes "selected elements from" the 2000 MRP, including the River Protection Overlay,

3    Management Zoning outside El Portal, Outstandingly Remarkable Values, river classifications

4    and river boundaries outside El Portal, which Plaintiffs unsuccessfully challenged in the

5    litigation over the 2000 MRP.   Defendants claim that NPS properly considers these elements

6    to be valid tools to further the mandate of the WSRA, and that NPS properly included these

7    elements in the no action alternative.

8        Plaintiffs suggest a no action alternative which is "the status quo without a CMP in

9    place and without the Yosemite Valley Plan and its proposed developments."   Defendants

10   argue that this proposal is completely untenable and contrary to the CEQ regulations.   They

11   claim that many Yosemite Valley Plan projects have been implemented, and it would be

12   impossible and contrary to NEPA to pretend that they are not part of the status quo.

13       In regard to the Yosemite Valley Plan, as Defendants note, this court previously

14   rejected Plaintiffs' claim that the 2000 MRP was improperly driven by that plan.  However,

15   that is not Plaintiffs' current argument.  Rather, Plaintiffs argue that the 2000 MRP approved

16   projects in the Yosemite Valley Plan, which, when implemented, had the effect of

17   predetermining user capacity.   Because the Ninth Circuit eventually held the 2000 MRP to be

18   invalid, Plaintiffs claim that it, combined with the Yosemite Valley Plan, illegally

19   predetermined user capacity.   Plaintiffs cite as an example NPS' current calculation of the no

20   action "baseline" for existing facilities such as parking places, based on the assumption that

21   the 2000 MRP is a valid baseline.

22       The court agrees with Defendants that it would be contrary to NEPA to pretend that the

23   various projects which have already been implemented under the Yosemite Valley Plan are

24   not now part of the status quo.  However, the court also agrees with Plaintiffs that because the

25   Ninth Circuit held the 2000 MRP to be illegal, NPS cannot properly include elements from

26   that plan in the no action alternative as the status quo.  The issue is not, as Defendants argue,

27

28                                            43

whether Plaintiffs challenged those elements before the Ninth Circuit.  The issue is that at the time  NPS was creating the no action alternative for the 2005 Revised Plan, the Ninth Circuit had explicitly held the entire 2000 MRP to be invalid, and <u>no comprehensive management plan for the Merced River existed</u>.  The elements from the 2000 MRP which NPS includes as the status quo had to be implemented, if at all, in the 2005 Revised Plan.  It was thus improper for NPS to refer to those elements as part of the status quo at the time the no action alternative was presented to the public.  A no action alternative in an EIS is meaningless if it assumes the existence of the very plan being proposed.

Accordingly, the court concludes that the SEIS violates NEPA in that it does not include a valid no action alternative.

As their second claim of how the SEIS violates NEPA, Plaintiffs contend that the 2005 Revised Plan is unreasonably narrow, and fails to provide meaningful options in terms of a permanent user capacity, or even an interim capacity.  Every alternative in the 2005 Revised Plan uses VERP to address user capacity, with the interim limit set for five years during the time VERP is being finalized.  Plaintiffs argue that the fact that every alternative has an "interim capacity limit" is further evidence that VERP was the only alternative considered.  Plaintiffs argue that because all action alternatives result in the exact same user capacity after five years, the Park Service has violated its duty to consider alternative courses of action pursuant to NEPA.  Plaintiffs suggest as an example that had NPS considered an alternative that used a quota system in the Merced River corridor, similar to the quota system used in wilderness areas, NPS would not have needed an interim capacity limit, because a permanent capacity limit would been established in this plan.

In regard to the interim limits, Plaintiffs argue that they are almost identical in all the alternatives.  Plaintiffs assert that there is no evidence in the record that any of the interim limits are linked to protecting the Merced River ORVs.

Defendants dispute Plaintiffs' claim that the Revised Plan and SEIS failed to evaluate

44

a reasonable range of alternatives.  Defendants acknowledge that each of the three action

alternatives shared similarities, such as the VERP framework and the Wilderness Trailhead

Quota System, but argue that they vary in other  ways.

This court has previously described the NEPA process in its March 2002 opinion.

Friends of Yosemite Valley, 194 F.Supp.2d at 1116-17:

> The alternative section is "the heart of the environmental impact statement,"40 C.F.R.
> § 1502.14; hence, "[t]he existence of a viable but unexamined alternative renders an
> environmental impact statement inadequate." Citizens for a Better Henderson v.
> Hodel, 768 F.2d 1051, 1057 (9th Cir.1985). While the practicalities of the requirement
> are difficult to define, NEPA provides that all agencies of the Federal Government
> shall, to the fullest extent possible, "[s]tudy, develop, and describe appropriate
> alternatives to recommended courses of action in any proposal which involves
> unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. §
> 4332(2)(E). Whether a particular EIS has met this demand can best  be determined by
> its purpose, which is to "ensure[ ] that federal agencies have sufficiently detailed
> information to decide whether to proceed with an action in light of potential
> environmental consequences, and [to] provide[ ] the public with information on the
> environmental impact of a proposed action and encourage[ ] public participation in the
> development of that information." Kunzman, 817 F.2d at 492; see also Citizens for a
> Better Henderson, 768 F.2d at 1056.
> As a result, an agency must look at every reasonable alternative, with the range
> dictated by the 'nature and scope of the proposed action,' Block, 690 F.2d at 761, and
> "sufficient to permit a reasoned choice." Methow Valley Citizens Council v. Regional
> Forester, 833 F.2d 810, 815 (9th Cir.1987), rev'd on other grounds sub nom. Robertson
> v. Methow Valley Citizens Council, 490 U.S. 332, 109 S.Ct. 1835, 104 L.Ed.2d 351
> (1989).
> In City of Carmel-By-The-Sea v. U.S. Department of Transportation, 123 F.3d 1142,
> 1145 (9th Cir.1997) the court further explained as follows:
> > An Environmental Impact Statement must discuss "reasonable alternatives" to
> > the proposed action. 42 U.S.C. § 4332(2)(C)(iii); Alaska Wilderness
> > Recreation v. Morrison, 67 F.3d 723, 729 (9th Cir.1995); see 40 C.F.R. §
> > 1502.14 (consideration of alternatives "is the heart of the environmental impact
> > statement."). The "rule of reason" guides both the choice of alternatives as well
> > as the extent to which the Environmental Impact Statement must discuss each
> > alternative. Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 195
> > (D.C.Cir.1991) (quoting State of Alaska v. Andrus, 580 F.2d 465, 475
> > (D.C.Cir.1978)). The Environmental Impact Statement need not consider an
> > infinite range of alternatives, only reasonable or feasible ones. 40 C.F.R. §
> > 1502.14(a)-(c). [FN10]
> > FN10. Title 40 C.F.R. § 1502.14(a) requires that an Environmental Impact
> > Statement:
> > Rigorously explore and objectively evaluate all reasonable alternatives, and for
> > alternatives which were eliminated from the detailed study, briefly discuss the
> > reasons for their having been eliminated.
> > Project alternatives derive from an Environmental Impact Statement's "Purpose
> > and Need" section, which briefly defines "the underlying purpose and need to
> > which the agency is responding in proposing the alternatives including the

proposed action." 40 C.F.R. § 1502.13. The stated goal of a project necessarily dictates the range of "reasonable" alternatives and an agency cannot define its objectives in unreasonably narrow terms. See Citizens Against Burlington, 938 F.2d at 196.

The court's review of the administrative record reveals that all of the action alternatives utilize VERP to address  user capacity.  Alternative 2, the preferred alternative eventually adopted, has interim limits restricting the number of lodging rooms, day visitor parking spaces, bus parking spaces, tour buses, employee bed spaces, and campsites.  As Plaintiffs note, however, these are no different than the limits identified for the no action alternative and Alternative 3.  It also appears that Alternative 4's limits are based on existing capacities, and therefore would be the same as for Alternative 2.  Thus, these numerical limits are essentially the same for all the alternatives.

Additional annual visitation limits are also imposed by Alternatives 3 and 4. Alternative 3 imposes an annual visitation limit of 5.32 million visitors, and each river segment has its own daily visitor cap.  Alternative 4 has an annual visitation limit of 3.27 million visitors, and also has management zone caps.  Although referred to by the NPS as "caps," these annual visitor limits could be altered if it is deemed appropriate by the NPS. Final Revised Merced Plan/SEIS, III - 31; IV-43.  Thus, as Plaintiffs argue, there is nothing permanent about these plans.  Alternative 4's annual numeric limit reduces visitor use by 3.4 percent from the 2004 level of 3.27 million people per year.  The basis for this limit is the number of people visiting the Merced River corridor in 1987, the year the river was designated under WSRA.  As stated above, however, there is no presumption that levels at that time were protective of the ORVs.

In light of these facts and the court's conclusion, explained above, that the VERP program in the 2005 Revised Plan  is inadequate to constitute the primary feature of a user capacity program as required by WSRA, this court must conclude that a EIS in which all alternatives are based on VERP program presents an inadequate range of alternatives under NEPA.

Plaintiffs' third  NEPA claim relates to the adequacy of the scientific information and data that supports the 2005 Revised Plan and SEIS.  They claim that the decisions and environmental analyses in the 2005 Revised Plan and SEIS are not based on either high-quality information or accurate scientific analysis about the location and condition of ORVs. They further claim that the 2005 Revised Plan fails to provide analysis of how the goal of protecting ORVs is achieved in light of the ongoing and foreseeable impacts to ORVs.

In response, Defendants claim that the premise for this claim is based on cases that address project-level EIS's, not programmatic EIS's such as the 2005 Revised Plan.  They argue that the Ninth Circuit previously rejected this argument, and held as follows:

> Applying the principles of the WSRA and NEPA, we conclude that the NPS did not abuse its discretion in preparing the CMP as a programmatic document, and that the CMP's EIS contains sufficiently specific data and information for such a purpose. We agree with the NPS that it must "prepare appropriate environmental review ( [pursuant to the] National Environmental Policy Act, National Historic Preservation Act, and other relevant legislation) for ... future actions" guided by the CMP, and anticipate that such review will include, where appropriate, data-gathering and analysis of system-wide impacts.

Friends of Yosemite Valley, 348 F.3d at 801.  Defendants claim that as was true with the 2000 Merced River Plan, the 2005 Revised Plan is a programmatic document that, by itself, makes no commitment of any specific resources.  They assert that no project-level decisions have been made in the 2005 Revised Plan, and that before specific projects are pursued, they will be evaluated for compliance with the 2005 Revised Plan and many will have to undergo site-specific NEPA evaluation.   Furthermore, Defendants assert, the information used in the 2005 Revised Plan and SEIS greatly exceeds the minimum statutory requirements of NEPA and WSRA.

In response, Plaintiffs repeat their claim  that under the Ninth Circuit's order, this plan must set limits on use.  Friends of Yosemite, 348 F.3d at 797, 799.  They argue that the 2005 Revised Plan and ROD expressly allow for visitor use in the Merced River corridor, and, that allowing use is a commitment of resources.  Plaintiffs also note that Defendants, in relying on the language quoted above,  omit the earlier language from the same opinion in which the

47

1    Ninth Circuit states, "<u>With the exception of the user capacities and river boundaries discussed</u>

2    <u>above</u>, the CMP was prepared with sufficiently specific data and information to satisfy

3    § 1281(a)'s goal of protecting and enhancing ORVs."   <u>Friends of Yosemite</u>, 348 F.3d at 799

4    (emphasis added).   Plaintiffs stress that the 2005 Revised Plan's decision to allow existing

5    uses to continue will not be reevaluated in a subsequent environmental analysis.

6         This court has already addressed the user capacity program of the 2005 Revised Plan,

7    finding it to be invalid.  Any further discussion regarding the sufficiency of the data

8    supporting that program is moot.   Similarly, this court has already addressed the El Portal

9    boundaries, finding the designation to be valid.  As stated above, the court declines to address

10   any claims relating to issues not included within the 2005 Revised Plan and covered only by

11   the invalid 2000 MRP.  Accordingly, the court declines to address the sufficiency of the

12   scientific information supporting the management zoning outside of the El Portal segment.

13   Neither party is entitled to summary judgment on this issue.

14

15   **Administrative Procedures Act**

16        In their first supplemental complaint, Plaintiffs allege as their fifth cause of action

17   various violations of the Administrative Procedure Act.   These alleged violations are simply

18   reiterations of Plaintiffs' other causes of action, restating the allegations regarding WSRA and

19   NEPA violations as APA violations.  As discussed above, the APA sets forth the standard of

20   review regarding final agency actions, providing that the reviewing court shall  hold unlawful

21   and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an

22   abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

23                              **ORDER**

24        In light of the foregoing, IT IS HEREBY ORDERED as follows:

25   1)    Defendants' request that the court dismiss this case for lack of subject matter

26        jurisdiction is DENIED;

27

28                              48

2)   Defendants' motion to strike Plaintiffs' four declarations and their supporting exhibits is DENIED;

3)   Plaintiffs' motion for summary judgment is partially GRANTED as to their first cause of action for violation of the Wild and Scenic Rivers Act based on the finding that NPS failed to adopt a single, self-contained comprehensive management plan for the Merced River;

4)   Plaintiffs' motion for summary judgment is partially GRANTED as to their first cause of action for violation of the Wild and Scenic Rivers Act based on the finding that NPS failed to adopt a valid user capacity program for the Merced River;

5)   Plaintiffs' motion for summary judgment is partially DENIED and Defendants' motion is partially GRANTED as to Plaintiffs' first cause of action for violation of the Wild and Scenic Rivers Act based on the finding that NPS did not abuse its discretion or otherwise violate WSRA in establishing the boundaries for the El Portal segment;

6)   Plaintiffs' motion for summary judgment is GRANTED as to their second cause of action for violation of the Wild and Scenic Rivers Act for failure to amend the General Management Plan to be consistent with a valid CMP;

7)   Plaintiffs' motion for summary judgment is partially GRANTED as to their third cause of action for violation of the National Environmental Policy Act based on the finding that the SEIS violates NEPA in that it does not include a valid no action alternative;

8)   Plaintiffs' motion for summary judgment is partially GRANTED as to their third cause of action for violation of the National Environmental Policy Act based on the finding that the SEIS violates NEPA in that it does not contain an adequate range of alternatives;

9)   Both parties' motions for summary judgment are DENIED as to the fourth cause of action for violation of the National Environmental Policy Act based on failure of NPS to base its decisions on high quality scientific information and data;

10)     Plaintiffs' motion for summary judgment is GRANTED as to their fifth cause of action alleging that Defendants have violated the APA by acted illegally and in violation of WSRA and NEPA in adopting the 2005 Revised Plan;

11)     A hearing on Plaintiffs' request for injunctive relief will be set by separate order.


IT IS SO ORDERED.

**Dated:    July 19, 2006**                    **/s/ Anthony W. Ishii**
0m8i78                                         UNITED STATES DISTRICT JUDGE

50