1

2

3

4

5

6

7            IN THE UNITED STATES DISTRICT COURT FOR THE

8                    EASTERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| 10  **FRIENDS OF YOSEMITE VALLEY, a**  ) <br> **non-profit corporation; and** ) | **CV F 00-6191 AWI DLB** |
| 11  **MARIPOSANS FOR** ) <br> **ENVIRONMENTALLY RESPONSIBLE** ) | **MEMORANDUM OPINION** <br> **AND ORDER RE PLAINTIFFS'** |
| 12  **GROWTH, a non-profit corporation,** ) <br> ) | **MOTION FOR INJUNCTIVE** <br> **RELIEF** |
| 13                **Plaintiffs,** ) <br> ) | |
| 14        **v.** ) <br> ) | [Doc. 312] |
| 15  **DIRK  KEMPTHORNE, in his official** ) <br> **capacity as Secretary of the Interior;** ) | Next Hearing Date: |
| 16  **DEPARTMENT OF THE INTERIOR;** ) <br> **NATIONAL PARK SERVICE; JOHN** ) | Tuesday, January 9, 2007 |
| 17  **REYNOLDS, in his official capacity as** ) <br> **Western Regional Director of the** ) | |
| 18  **National Park Service; DAVID A.** ) <br> **MILHALIC, in his official capacity as** ) | |
| 19  **Superintendent of Yosemite National** ) <br> **Park; and ROBERT STANTON, in his** ) | |
| 20  **official capacity as Director of the** ) <br> **National Park  Service,** ) | |
| 21                                   ) <br> ) | |
| 22                **Defendants.** ) <br> _____) | |

23

24

25        The lengthy procedural history of this case has been previously set forth, most recently in

26   the Memorandum Opinion and Order entered on July 19, 2006, in which this court found the

27   2005 Merced Wild and Scenic River Revised Comprehensive Management Plan and

28   Supplemental Environmental Impact Statement ("2005 Revised Plan") to be invalid.  The case

now proceeds on Plaintiffs' request for injunctive relief in which they ask the court to do the following:

(1) set aside the 2005 Revised Plan and order Defendants to prepare a legally valid Wild and Scenic River Comprehensive Management Plan within a specific time frame;

(2) order Defendants to comply with the National Environmental Policy Act, 42 U.S.C. Section 4321-4370d ("NEPA") in the development of a legally valid Comprehensive Management Plan ("CMP") by preparing an environmental impact statement ("EIS");

(3) enjoin Defendants from authorizing or permitting to continue, any ground-disturbing activities or projects which rely upon the 2005 Revised Plan, or its predecessor, the 2000 Merced Wild and Scenic River Comprehensive Management Plan ("2000 MRP") and that could impact or alter the Wild and Scenic Merced River's outstandingly remarkable values ("ORVs") or free-flowing nature, until a legally valid CMP is adopted and approved by this court; and

(4) order Defendants to amend the General Management Plan upon adoption of a legally valid CMP.

Oral argument was heard on October 16, 2006.

## LEGAL STANDARD

In <u>Amoco Production Co. v. Village of Gambell, Alaska</u>, 480 U.S. 531, 542 (1987), the Supreme Court summarized its holding in <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 311-313(1982) as follows:

> We reviewed the well-established principles governing the award of equitable relief in federal courts. Id., at 311-313, 102 S.Ct., at 1802-1804. In brief, the bases for injunctive relief are irreparable injury and inadequacy of legal remedies. In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. Although particular regard should be given to the public interest, "[t]he grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." <u>Id.</u>, at 313, 102 S.Ct., at 1803.

The Ninth Circuit subsequent provided this further discussion of injunctive relief in the case of environmental litigation.

> A district court has "broad latitude in fashioning equitable relief when necessary to remedy an established wrong." <u>Natural Res. Def. Council v. Southwest Marine, Inc.</u>, 236

F.3d 985, 999 (9th Cir.2000)(internal quotation marks omitted). The traditional bases for injunctive relief are irreparable injury and inadequacy of legal remedies. Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). In issuing an injunction, the court must balance the equities between the parties and give due regard to the public interest. Id. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e. irreparable." Id. at 545, 107 S.Ct. 1396.

a. Irreparable Injury

In the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action. Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir.1985). While an injunction does not automatically issue upon a finding that an agency violated NEPA, "the presence of strong NEPA claims gives rise to more liberal standards for granting an injunction." American Motorcyclist Ass'n v. Watt, 714 F.2d 962, 965 (9th Cir.1983). If environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment. Amoco, 480 U.S. at 545, 107 S.Ct. 1396.

High Sierra Hiker's Ass'n v. Blackwell, 390 F.3d 630, 641 - 42 (Cal. 2004).   Similarly, in regard to WSRA, this court has held in a predecessor to the present case,

[W]here, as here, an agency has egregiously violated a procedural planning requirement which is closely linked to the ability of the agency to adequately assess the impacts of future plans and actions on the river's ORV's, that procedural violation lends great weight to assertions that the substantive requirement to preserve and enhance the values for which river was included in the wild and scenic river system has been violated. While applicable case law does prevent the issuance of injunctive relief based solely on the violation of the requirement that NPS formulate a comprehensive management plan, this court can find no authority that prohibits the consideration of this procedural violation in the determination of whether agency plans or actions violated the substantive provisions of the WSRA.

Sierra Club v. Babbit, 69 F.Supp.2d 1202, 1251 (E.D. Cal. 1999).

## DISCUSSION

In support of their request for injunctive relief, Plaintiffs contend  generally that development in Yosemite National Park cannot proceed in the absence of a valid CMP. Plaintiffs argue that in the absence of a valid CMP with specific limits on actual visitor use, development may adversely impact the Merced River's ORVs.

**A.  Issuance of Valid Wild and Scenic River Comprehensive Management Plan**

Plaintiffs ask the court to set aside the 2005 Revised Plan, based on the court's finding that the plan is invalid.  Plaintiffs further ask the court to order Defendants to prepare a legally valid Wild and Scenic River Comprehensive Management Plan and EIS within a specific time frame. Plaintiffs do not provide a proposed time frame, noting that in 2004, this court directed NPS to

complete a new or revised CMP within one year, the time period proposed by Defendants. Plaintiffs opine that one year was insufficient, because NPS was unable to produce a valid CMP during that time period.   Plaintiffs ask the court to set a definite time frame, longer than one year, for Defendants to develop and present to the court a valid CMP.

In response, Defendants assert that the court's "summary judgment ruling presents a number of significant questions regarding the contents of a CMP and EIS that would meet all of the WSRA requirements, as construed both by this Court and the Ninth Circuit."  They further claim that it would be "premature and quite possibly counterproductive" for the court to set a deadline for the completion of a new CMP until Defendants are able to assess the impact of this court's ruling on the pending motion for injunctive relief."  Defendants thus ask the court to allow them to consider the combined impact of the court's prior summary judgment ruling and present ruling on Plaintiffs' motion for injunctive relief and prepare a new schedule to comply with the Court's orders.  They suggest that once NPS is able to prepare such a schedule, Plaintiffs could renew their request for a specific deadline to be established.

At oral argument, Defendants stated that they needed to do a "thorough reanalysis" and that if Plaintiffs were granted the injunctive relief they sought, a "completely different approach" might be required.  Defendants proposed returning to the court in January 2007 with a specific proposal, including "some specific time lines and specific interim steps."

Defendants provide no explanation as to why this court's ruling on Plaintiffs' request for injunctive relief should impact their ability to comply with their statutory duty to provide a CMP for the Merced River, and no such explanation is evident.  The rulings in regard to Plaintiffs' request for injunctive relief are separate and apart from Defendants' duty to comply with the Wild and Scenic Rivers Act, and Defendants must proceed with creating a valid CMP completely apart from whether or not they can proceed on projects they have planned.  Based on both their express statements and their inability to give the court a suggested deadline now, Defendants have made it clear that they intend to  factor in all their other work when deciding how soon they can get the CMP done.  This approach is unacceptable and the court notes the enormous delay that has occurred in the creation of a CMP for the Merced Wild and Scenic River.

4

1    The court will grant Plaintiffs' request to set aside the 2005 Revised Plan, based on the

2    court's finding that the plan is invalid.  The court will further grant Plaintiffs' request to order

3    Defendants to prepare a legally valid Wild and Scenic River Comprehensive Management Plan

4    and EIS within a specific time frame.  Based on the representation of counsel at the hearing on

5    this matter, the court is inclined to set a two-year time limit for the creation of a valid CMP for the

6    Merced Wild and Scenic River.  However, the court will set a status conference for the parties to

7    discuss this matter and to create a time frame for the creation of the CMP, including interim

8    deadlines.

9    **B.  Injunctive Relief Regarding Park Projects**

10   **a.  Broad Relief**

11       Plaintiffs request that this court issue an order enjoining Defendants "from authorizing or

12   permitting to continue, any ground-disturbing activities or projects which rely upon the 2005

13   Revised Plan, or its predecessor, the 2000 Merced Wild and Scenic River Comprehensive

14   Management Plan ("2000 MRP"), and could impact or alter the Wild and Scenic Merced River's

15   outstandingly remarkable values ("ORVs") or free-flowing nature, until a legally valid CMP is

16   adopted and approved by this Court."   They also request that the court enjoin NPS from

17   proceeding with any other projects, not yet disclosed by Defendants, "which rely upon and tier to

18   a CMP," until a valid CMP is issued.  Plaintiffs argue that such an injunction is necessary to

19   prevent irreparable injury to both a valid future CMP process and to the outstandingly remarkable

20   values of the Merced River.

21       Defendants contend in response that under the governing law, Plaintiffs are not entitled to

22   such a broad injunction.  They argue that the cases cited by Plaintiffs, including Portland Audobon

23   Society v. Lujan, 795 F.Supp. 1489 (D.Or. 1992), aff'd, 998 F.2d 705 (9th Cir. 1993), are

24   distinguishable, and that the evidence shows that each of the projects challenged by Plaintiffs will

25   enhance one or more of the Merced River's ORVs.

26       A request for a similarly broad injunctive was previously rejected by this court at pages 15

27   through 19 of the July 6, 2004 Memorandum Opinion and Order in regard to the MRP.  That

28   discussion is hereby incorporated into the present  Memorandum Opinion and Order and

1  Plaintiffs' request for broad injunctive relief is rejected for the reasons stated therein.

2  **b.  Relief as to Specific Projects**

3  Plaintiffs state that they seek an order enjoining, "at a minimum," the following projects:

4  1.  Yosemite Lodge Redevelopment and Northside Drive Relocation

5  2.  Curry Village Cabins and East Yosemite Valley Expanded Campgrounds

6  3.  Yosemite Valley Parking and Transit Area Improvements (Camp 6 Parking)

7  4.  East Yosemite Valley Utilities Improvement Plan ("Utilities Plan" or "Utilities project")[1]

8  5.  Happy Isles Footbridge

9  6.  Removal of El Portal Wastewater Treatment Facility

10  7.  Ecological Restoration and Bank Rehabilitation

11  8.  Yosemite Valley Loop Road

12  9.  Yosemite Valley Loop Trail.[2]

13  Yosemite Lodge Redevelopment and Northside Drive Relocation

14  Plaintiffs request the court to enjoin the Yosemite Lodge Redevelopment and Northside

15  Drive Relocation project on the ground that it relies upon the 2000 Merced River Plan, the now

16  non-existent comprehensive management plan for the Merced River.  They rely on Superintendent

17  Tollefson's Declaration, filed on February 26, 2004 ("February 2004 Tollefson Declaration") in

18  which he states:

19  New development and restoration activities in Yosemite Valley are guided by the Merced
    River Plan and the Final Yosemite Valley Plan/SEIS and its Record of Decision.  The
20  Yosemite Lodge Area Redevelopment, which is tiered from these plans, will implement
    Yosemite Lodge and Camp 4 related projects that were identified and analyzed as part of
21  the comprehensive Yosemite Valley planning process.

22  February 2004 Tollefson Declaration, Ex. 5 (Lodge FONSI, 1 - 21).

23  The Merced River Plan applies to any project that is within the Wild and Scenic River
    boundary, or that would affect the Outstandingly Remarkable Values or free-flowing
24  condition of the river.  The majority of the Yosemite Lodge Area Redevelopment site is

25  _____

26  [1]Projects 1, 2, 3 and 4 were previously enjoined in this court's July 6, 2004 Memorandum
    Opinion and Order.

27  [2]Plaintiffs originally also sought to enjoin the project involving the Abbieville Sewage
    Lift Station at El Portal.  In their Reply memorandum, Plaintiffs state that they have reviewed the
28  materials provided by Defendants and have decided not to seek an injunction as to this project.

1    located within the Merced Wild and Scenic River Boundary and complies with the
2    management elements prescribed in the Merced River Plan [2000 MRP].

3    Id., Ex. 4 (Yosemite Lodge Area Redevelopment Project Environmental Assessment, VI2.

4         Plaintiffs note that according to the Yosemite Valley Plan SEIS, this project will "result in
5    expanded human presence and fragmentation into upland habitats."  Yosemite Valley Plan SEIS
6    Vol. 1B, 4.2 -54, 4.2-29.  Further, wetlands will be altered by the relocation of Northside Drive
7    adjacent to the Merced River.  Id. at Vol. 1B, part 1, at p. 4.2 -17.   According to the Lodge
8    FONSI, archeological sites will be adversely impacted by the Northside Drive realignment as well
9    as from trenching for utility construction.  Finally, argue Plaintiffs, the project will adversely
10   impact vegetation, wildlife and noise levels.  Id. At 1-15, 1-16.

11        In response, Defendants rely on the Declaration of Superintendent Tollefson, wherein he
12   explains  that, as noted in the Memorandum Opinion and Order of July 6, 2004,  Defendants did
13   not previously contest the entry of an injunction as to this project.  He states that he now no longer
14   believes that the public interest warrants a continued voluntary delay of this project.  Seventh
15   Tollefson Declaration, ¶ 48.  In support of going forward with the project, Superintendent
16   Tollefson states that NPS is currently prepared to implement only the first phase of the project.
17   He explains:

18        The first phase of the Yosemite Lodge project will relocate 90 of the existing 245 room
          within the existing footprint of the Lodge. This increase of only 2 rooms has no material
19        effect on capacity. [footnote omitted]   Phase 1 of this project will also remove 5 motel
          buildings (Laurel, Juniper, Hemlock, Maple, and Alder buildings)[3] and housekeeping and
20        maintenance buildings out of the floodplain.  Replacement of these structures is necessary
          before the NPS can complete the restoration of 37 acres of wetland and riparian habitat
21        along the river.

22   Id. at ¶ 49.  Defendants argue that this restoration work along the rive r is the principal
23
     environmental benefit of the project and swings the balance of equities in favor of allowing the
24
     work to proceed.
25
26        Defendants argue that extensive environmental evaluation of the Yosemite Lodge project

27        [3]At the hearing, Counsel for Defendants corrected the information provided by
     Superintendent Tollefson to state that project  would remove four, rather than five, motel
28   buildings.

7

1  has been completed and documented in the Yosemite Lodge Area Redevelopment Environmental
2  Assessment ("Lodge EA") and Finding of No Significant Impact ("Lodge FONSI").
3  Superintendent Tollefson opines that these documents demonstrate that the project "will not cause
4  a significant effect on the human environment, will not impair park resources, will not result in
5  adverse impact to wetlands, and will not impair the NPS's ability to protect Wild and Scenic
6  River values and address the user capacity mandate of the Wild and Scenic Rivers Act." Id. at ¶
7  50.  Defendants assert that NPS has fulfilled its statutory requirements in regard to environmental
8  analysis of this project.

9       Defendants argue that the project provides numerous environmental benefits, including
10 ecological restoration to improve the Merced River's free-flowing condition, eradication of non-
11 native plants, and revegetation with native plants.  They also claim that the relocation of North
12 Side Drive will serve as a functional barrier, protecting the river to the south.

13      Defendants contend that public safety concerns weigh in favor of denying injunctive relief,
14 as the project will convert the present roadway into a pedestrian promenade, eliminating a hazard
15 to pedestrians viewing Yosemite Falls.   This improvement in public safety, the relocation of
16 buildings and facilities outside the 100-year floodplain into previously disturbed areas, and the
17 restoration of 37 acres of riparian land within the floodplain are the key public benefits of
18 proceeding with Phase 1 of the project relied upon by Defendants in opposing the request for
19 injunctive relief.

20      As Plaintiffs argue in their Reply, the Yosemite Lodge EA states that Phase 1 calls for a
21 two-year period of construction activity, followed by a "several-year period of construction
22 inactivity at the site."  Only after that would restoration and revegetation activity occur as part of
23 Phase 3.  Further, there is no indication that the relocation of Northside drive is to take place as
24 part of Phase 1 of the project.  Thus, the restoration of the 37 acres of riparian land and the
25 relocation of Northside drive and the associated improvement in public safety are not part of
26 Phase 1 of the project.  The court therefore rejects Defendants' claim that public benefits
27 associated with these aspects of the project provide direct support for allowing NPS to go forward
28 with Phase 1.

Plaintiffs argue persuasively that the cumulative impacts associated with development of the Yosemite Lodge project have not been evaluated, noting that the Lodge EA action alternatives all rely on the cumulative impact analysis for Alternative 1, the no action alternative.  The cumulative impact analysis for Alternative 1 states that because the cumulative projects are in the early planning stages, the evaluation of the cumulative impact was based on a general description of the projects.  Appendix F provides a list of these projects, but does not provide information or analysis of any of the resource impacts.

Finally, and most importantly, the Yosemite Lodge project is directly tiered to the invalid 2000 CMP and its management elements, which include the VERP.  Specifically, the Lodge EA expressly provides that these management elements were used to evaluate the Yosemite Lodge Area Redevelopment.  The 2000 CMP having been held to be invalid, Defendants are simply incorrect in claiming that NPS has fulfilled its "statutory requirements" in regard to environmental analysis of this project.

Based on the above, the court finds that the balance of harms alleged by the parties clearly ways in favor of the issuance of an injunction preventing Defendants from proceeding on the Yosemite Lodge Redevelopment and Northside Drive Relocation project until after the adoption of a valid CMP for the Merced Wild and Scenic River.  Accordingly, the court will grant Plaintiffs' request for relief as to this project.

Curry Village Cabins and East Yosemite Valley Expanded Campgrounds

Plaintiffs state that the Curry Village project calls for 108 new cabin rooms with baths for visitor lodging, reconstruction of three campgrounds, and development of two new campgrounds.  They claim, relying on the Yosemite Valley Plan Supplemental Environmental Impact Statement that this new development will adversely impact black oak and riparian vegetation, wetlands and other highly valued resources.  They argue that according to the Curry Village Environmental Assessment,  filling wetlands in the area of the campground check station "would permanently alter hydrologic function and wetland vegetation and result in direct habitat loss and potentially degradation of wetlands and waters downstream if flow into adjacent areas is reduced.  They claim that the project increases the need for utility capacity, which bears a direct relationship to

the development of user capacity, an issue in the CMP for the Merced River.

Plaintiffs contend that under the Curry Village FONSI and Environmental Assessment, the construction of the campsites in the floodplain not only increases erosion and sedimentation, but also increases the potential for point sources pollution, and will adversely impact wildlife.

Defendants state that they propose to begin work to replace only 89 of the 353 campsites lost in the 1997 flood.  Thirty of those sites will accommodate recreation vehicles and the remaining 59 sites are designed as "walk-in" campsites.  Seventh Tollefson Declaration, ¶ 39. Defendants affirmatively state that they do not presently propose to construct the 108 new cabin rooms included in the initial planning.  Id.  They further assert that NPS has completed environmental compliance for the project.

Defendants state that NPS has received disability rights complaints under Section 504 of the Rehabilitation Act regarding lack of accessibility of campgrounds and other Yosemite facilities by people with mobility impairments and other disabilities.   Seventh Tolleffson Declaration, ¶ 43.  Defendants assert that to respond to these complaints, NPS is required to comply with the American's Architectural Barrier's Act of 1968 and the associated Accessibility Guidelines for Buildings and Facilities.  Id. at ¶ 44. To do so, NPS would have to increase the number of accessible campsites in the Upper, Lower and North Pines Campgrounds from the current total of 3 to 12.  This project would result in 8 new accessible campsites, bringing the total to 11.  Defendants argue that an injunction would prevent compliance with these laws.  Finally, Defendants argue that the equities weigh in favor of denying the injunction, because of the great public interest in more camping opportunities in Yosemite Valley.

In the July 6, 2004 Memorandum Opinion and Order at pages 33 through 34, this court held as follows regarding this project:

> Conclusion
>         At the hearing, counsel for Defendants explained that NPS does not currently seek to go forward with all 17 portions of the Campgrounds Project listed by Plaintiffs, but seeks to go forward only on the new RV drive-in camping loop at Upper Pines Campground and the new walk-in sites at Upper Pines Campground.   The court finds that, regardless of  the extent to which Defendants now  want to proceed on the project, any progress on the project will at least to some extent  predetermine user capacity for the area in question.  This in turn could easily prejudice Defendants' decision making in regard to user capacity decisions for the area in the new or revised CMP.  The court finds, therefore,

that Plaintiffs have demonstrated the possibility of irreparable injury should this project go forward at the present time.

      In balancing the interests of the parties, the court finds that  while NPS has a legitimate interest in the completion of this project so as to provide additional lodging for visitors to Yosemite, present completion of the project  would be against the public's interest in that it would inhibit the ability of  NPS to make decisions about user capacity without being influenced by newly expanded development.   The court finds that NPS's interest (and arguably the public's) in presently going forward with this project is simply outweighed by the public's interest in having NPS make an unprejudiced decision in regard to user capacity in the new or revised CMP for the Merced River.  Further, the court finds no major injury to either NPS or the public which would benefit from the new lodging facilities in simply delaying this project for one year until the completion of the new or revised CMP.  Thus, the court concludes that the equities come out on the side of Plaintiffs in regard to the Curry Village Cabins and Campgrounds project.  Thus, the court will grant Plaintiffs' request for injunctive relief as to the campgrounds project.

The court finds no reason to deviate from this analysis.  It is unfortunate that delay has now increased from the original one year, but NPS' failure to provide a valid CMP for the Merced River cannot form a basis for allowing decisions regarding user capacity to be prejudiced. Similarly, NPS' duty to comply with disability rights law cannot provide a basis for prejudicing decisions NPS must make under WSRA.   Accordingly, the court will grant Plaintiffs' request for relief as to this project until after completion of a valid CMP.

Yosemite Village Parking and Transit Area Improvements (Camp 6)

Plaintiffs contend that this project is in a floodplain and will directly impact the Merced River. Valley Plan SEIS Vol. 1B, 4.6-1.  They assert that the Camp 6 project proposes to develop parking for 550 vehicles and impacts 8 acres of vegetation, including meadows, relying on the YVP SEIS Vol. 1B, 4.2 - 30, 33.

Defendants explain in response that the Camp 6 interim parking project is in its preliminary NEPA planning stage and that no ground-disturbing action will be taken until all environmental compliance is completed, which could be one to three years from now.  Seventh Tollefson Declaration, ¶ 63.  They state that this is not the project as proposed in the Yosemite Valley Plan, but an interim solution to address immediate concerns.  Id. at ¶ 65.  Defendants claim that the interim project will not increase or predetermine or prejudice user capacity in Yosemite Valley or the Merced River Corridor because the project will not increase parking or transit bus capacity.   They assert that the project "largely" will be limited to developed areas and areas

11

1  occupied by existing parking and roadways and will allow the park to protect and enhance river

2  values, particularly with regard to water quality.   Id.

3         In their Reply, Plaintiffs argue that NPS's claim of no ground-disturbing activities for one

4  to three years is disingenuous, because has conducted ground-disturbing activities at Camp 6 as

5  part of ongoing piecemeal development since the 1997 flood.   They stress that Camp 6 is a

6  portion of the Merced River floodplain and in parts remains a meadow/wetland area immediately

7  adjacent to the river.

8         As Defendants argue, this court has previously allowed projects such as the ecological

9  restoration which were in the preliminary planning stages to go forward without the existence of a

10 valid CMP.   In light of Defendants' assertions that a primary goal of the project is pull parking

11 and facilities back from the river, and to restore adjacent wetlands and riparian habitat, the court

12 will allow this preliminary planning  stage of the project to go forward.  However, in light of the

13 undisputed fact that Camp 6 is in the Merced River floodplain and in parts is a wetland

14 immediately adjacent to the river, the court finds that the equities balance in favor of enjoining

15 any ground-disturbing activities until after the creation of a valid CMP.  It is unclear at this

16 juncture which will be completed first, the preliminary planning stages for this project or a valid

17 CMP.  Accordingly, the court will grant Plaintiffs' request for injunctive relief as to any ground-

18 disturbing activities in regard to this project until after the creation of a valid CMP for the Merced

19 Wild and Scenic River.

20 East Yosemite Valley Utilities Improvement Plan

21        Plaintiffs seek to have the court enjoin phases 2 and 3 of the East Yosemite Valley

22 Utilities Improvement Plan ("Utilities Plan") and phase 2 of the Yosemite Valley Sanitary Sewer

23 Capital Improvement Plan (CIP").  Relying on the Utilities Environmental Assessment and

24 FONSI, Plaintiffs argue that the Utilities Plan will increase capacity, place demands on park

25 operations and services, destroy native wetlands, impact aquatic habitats, and destroy cultural

26 resources.

27        In the July 6, 2004 Memorandum Opinion and Order, the court enjoined work on Phase 1

28 of the Utilities Plan, On November 1, 2004, following briefing and a hearing, the court granting

1  Defendants' motion and modified the July 6 Order to allow NPS to proceed with Phase 1 of the

2  Utilities Plan.  This court held:

3          The court finds that Defendants have established the real possibility of accidental
   sewage discharges, as demonstrated by the July 5th incident, that threaten both public
4  health and the environment as a whole and particularly the Outstandingly Remarkable
   Values of the Wild and Scenic Merced River.  They have further established that this
5  threat cannot be remedied by mere improved maintenance, and that compliance with the
   CAO can only be accomplished through substantive repairs to the sewer system.  As set
6  forth at length above, Defendants have developed a plan, set forth in Option 1,  for
   effecting these repairs which has been approved by experts with specific knowledge and
7  experience as to the specific sewer system in question, experts who opine that these repairs
   are necessary for compliance with the CAO.   Further, Option 1 has already been subject to
8  NEPA analysis as part of the Utilities Plan.  Finally, Defendants have provided the
   assurances of both these experts and Superintendent Tollefson  that these repairs will not
9  increase user capacity.
          When it issued the Memorandum Opinion and Order of July 6, 2004, the court was
10 "unconvinced of the urgency of implementing the Utilities Plan before the completion of
   the new or revised CMP for the Merced River."  Further, the court found that there was
11 "no indication that the first phase [of the Utilities Plan]  would fix the damage which
   Defendants assert justifies the implementation of the Utilities Plan at the present time."
12 Now, after reviewing the expert declarations provided by the Defendants in support of the
   present motion, the court is convinced of the urgency of implementing the limited portion
13 of the Utilities Plan known as Option 1 before completion of the new or revised CMP, as
   necessary to comply with the CAO.   Indeed, the court is convinced that there is a serious
14 risk that irreparable injury will occur if Option 1 is not implemented as soon as possible.
   Further, the court finds that Option 1 falls within the exception set forth in the injunction
15 issued July 6, 2004, as "repairs necessary for compliance with the Clean up and
   Abatement Order."
16        In balancing the harms, the court finds, again relying on the expert opinions
   provided by Defendants' declarants, that greater harm would accrue by denying Defendants'
17 request than would granting it.   Further, Defendants' request to implement
   only a limited portion of the Utilities Plan defined in Option 1, along with their express
18 disavowal of any purpose to take action that  would predetermine user capacity for the
   areas affected relieves much of the basis for the issuance of the injunction.
19        Finally, the court finds that the public interest clearly weighs in favor of
   implementing the repairs specified by Defendants, not only to comply with the CAO, but
20 also to protect public health and the precious Outstandingly Remarkable Values of the
   Merced River.  Not only is protection of the Outstandingly Remarkable Values the duty of
21 NPS, the federal agency entrusted with the care of Yosemite National Park, but it is the
   ultimate goal towards which all parties and interested persons in this action continue to
22 strive.  Further, protection of the public health and the Outstandingly Remarkable Values
   is in the public interest to a very high degree, both for the present and for future
23 generations for whom the Park is held in trust.  Finally, the court notes that Superintendent
   Tollefson states that "as a practical matter, applicable water, electrical, and
24 communications utilities will be co-located in the utility corridor with the new sewer line.
   These lines are required to support existing, outdated service connections."  The court
25 finds that it is in the public's interest that repairs and  improvements be done in the most
   practical, cost-effective way, and will not attempt to micro-manage the matters which NPS
26 is mandated to handle.  See generally, 5 U.S.C. § 706(2)(A); Kleppe v. Sierra Club, 427
   U.S. 390, 412 (1976)( absent a showing of arbitrary action, a court must assume that an
27 agency has exercised its discretion appropriately).
          Accordingly, based on all of the above, the court finds, in exercise of its equitable
28 discretion, that Defendants' motion should be granted.

1

2        Defendants state that since the fall of 2004, NPS has nearly completed the most urgent

3   work under phase 1 of the Utilities Plan.  They state, however, that phases 2 and 3 of the Utilities

4   Plan and phase 2 of the CIP involve "considerable and critically important work" designed to

5   ensure compliance with the CAO.  Seventh Tollefson Declaration, ¶ 26.  Superintendent Tollefson

6   describes the projects in detail, and, as before, commits to the court that these projects will not

7   allow for increased visitation or use of the park."  Id. at ¶ 31. Defendants also provide the

8   declaration of Alexander R. Peterson, the Registered Professional Engineer with the firm of

9   Kennedy/Jenks Consultant, Engineers and Scientists on whose testimony this court relied in the

10  November 1, 2004 Memorandum Opinion and Order.  Mr. Peterson states in part that,

11  "[c]ompletion of the rehabilitation and replacement projects identified in the [IUMP] Phases 2 and

12  3 and the [CIP] Phase 2 are necessary to remedy existing deficiencies, to improve sewer system

13  functionality, and to continue to implement the park's Grease Management Plan.  Each of these

14  steps are in accordance with the requirements of CAO.  It is my professional opinion that

15  completion of these projects is the most expeditious and responsible way to avoid future sewage

16  spills and SSOs."  Peterson Declaration, ¶ 12.

17        In response, Plaintiffs argue in their Reply that the record does not establish that any

18  emergency or immediate repairs are needed at this time, and what remains from the CIP are

19  intermediate or long-term repairs which, according to the Utilities EA, are to be undertaken during

20  2007-2013.  Further, they argue that Defendants' attempt to demonstrate urgency based on spills

21  is ineffective, as the spills they cite either did not involve infracstructure problems or predate this

22  court's prior modification of the injunction to allow repairs.

23        The court must agree with Plaintiffs that, if as Mr. Peterson says, the CIP figures are no

24  longer accurate, there is no document explaining what is the defined scope of work and what

25  changes may now be necessary.  While Defendants may prefer to complete the Utilities Project at

26  the present time, the court finds that they have not demonstrated the existence a health and safety

27  issue to the degree that would justify proceeding on the project without a valid CMP.  This is

28  particularly true because of the project's potential to increase use by accommodating proposed

14

facilities and development, as set forth in the Utilities EA, and the immediate affects that the

project will have on the environment.  Therefore, the equities weigh in favor of enjoining any

further work on the Utilities Project until after completion of a valid CMP.  Accordingly,

Plaintiffs' request for injunctive relief will be granted as to this project.

Happy Isles Footbridge

Plaintiffs seek to enjoin the construction of a new footbridge at Happy Isles.  They explain

that in 2001, an environmental assessment with a Finding of No Significant Impact was adopted

by NPS to remove the Happy Isles Footbridge.  Superintendent Tollefson explains in his

Declaration as follows:

> upon completing a site-specific environmental compliance process, the removal of the
> flood-damaged Happy Isles Gauging Station Bridge was completed in the fall of 2001.
> Removal of the bridge has returned the river to its free-flowing condition and has
> protected and enhanced the hydrologic processes, biological, cultural, recreation, and
> scenic Outstandingly Remarkable Values (ORVs) in this Yosemite Valley segment of the
> river corridor. This project was called for in the YVP and was also the subject of a tiered,
> site-specific EA and a subsequent Finding of No Significant Impact (FONSI).

Tollefson Declaration, ¶ 11.

Plaintiffs argue that NPS now seeks to undo this benefit to install a bridge.  They assert

that while NPS provided NEPA review for the removal of the Happy Isles Footbridge, it has not

conducted any specific environmental review for installation of a bridge.  Plaintiffs state that NPS

relies instead on the Valley Plan, which, according to Superintendent Tollefson, recognizes that a

project "such as construction of a replacement footbridge at the Happy Isles area and construction

of a vehicle bridge across Yosemite Creek near Yosemite Lodge, have the potential to adversely

affect local wetlands."

In response, Defendants that since the original footbridge was removed, hikers have been

detoured to the north side of the river so they can reach popular wilderness trailheads.  Seventh

Tollefson Declaration, ¶ 19.  This detour has resulted in visitors crossing the Happy Isles vehicle

bridge, where they are exposed to the danger of oncoming traffic.  It has also resulted in

degradation to the area as the riverbank has been trampled.  Id.  They therefore assert that the

replacement bridge is needed for hiker safety and for protection of the sensitive riparian

1   vegetation in the area.

2        In regard to Plaintiffs' claims regarding lack of information and environmental compliance

3   regarding the bridge project, Defendants assert that the Yosemite Valley Plan specifies that a

4   replacement bridge meet the following requirements: 1) be designed to span the 100-year

5   floodplain, so as not to effect the hydrology of, or impair the 100-year flood nor constrict the free-

6   flowing condition of the river; and 2) be designed to meet the architectural guidelines for

7   Yosemite Valley.  Seventh Tollefson Declaration, ¶ 22.  They further assert that the new

8   footbridge has been designed to meet these requirements and that NEPA requirements have been

9   finalized in a Memorandum-to-File which explains that the Yosemite Valley Plan provides

10  sufficient detail and analysis under NEPA for this project to proceed.  Id.   Finally, Defendants

11  assert that this project will have no effect on user capacity, because it only reestablishes the

12  original access from the Yosemite Valley Loop Trail to the John Muir Trailhead and the Half

13  Dome Trailhead.

14       In response to Defendants' argument regarding environmental compliance, Plaintiffs stress

15  that the "memorandum-to-file," dated September 18, 2006, post-dates the filing of the present

16  motion, and argue that it was created in response thereto.  Plaintiffs note that the Happy Isles EA

17  states, "[i]f the National Park Service determines that a new bridge is necessary, appropriate site-

18  specific evaluation pursuant to the National Environmental Policy Act will be conducted."  They

19  argue that the memorandum now relied upon by Defendants is not consistent with this statement,

20  arguing that it is not a NEPA compliant document.  Rather, it is merely a memorandum, which

21  has not been subject to scoping or public review.

22       The court finds that, as explained by Defendants, there are public safety issues associated

23  with the creation of a new Happy Isles footbridge.  However, the court further finds that

24  Defendants have in no way demonstrated that the public safety issues created by pedestrians

25  crossing the vehicle bridge could not be otherwise ameliorated, or why they have not already be

26  addressed.   The same is true regarding the issue of visitors trampling the vegetation along the

27  riverbank.  In light of the issues raised by Plaintiffs regarding environmental compliance and,

28  most particularly,  this project's immediate proximity to the river, the court finds that the equities

16

1    weigh in favor of enjoining this project until after completion of a valid CMP for the Merced Wild

2    and Scenic River.        Accordingly, Plaintiffs' request for injunctive relief will be granted as to

3    this project.

4    <u>El Portal Wastewater Treatment Facility</u>

5         Plaintiffs request this court to enjoin NPS from removing a wastewater treatment facility

6    which has been inactive since 1975. Plaintiffs base this request on their assertion that the site,

7    which is undisputably within the Merced River corridor, and is a known prehistoric burial ground

8    containing Native American human remains up to 9,500 years old.  The Yosemite Valley Plan

9    SEIS identifies the site as a "sensitive cultural area."  Plaintiffs' basis for requesting that the court

10   enjoin the removal of the wastewater treatment facility is their assertion that its removal "exposes

11   this site to significant degradation, if not total destruction."

12         In response, Defendants cite the declaration of Superintendent Tollefson, who explains

13   that the facility has been abandoned for more than 30 years.  Seventh Tollefson Declaration, ¶ 12.

14   The project, which is restricted to previously disturbed ground,  consists of demolishing and

15   removing five dilapidated concrete structures and the re-vegetation of the area.  <u>Id</u>., ¶ 14.

16   Superintendent Tollefson states that all appropriate NEPA, National Historic Preservation Act,

17   and Native American Graves Protection and Repatriation Act compliance has been completed.  <u>Id</u>.

18   Superintendent Tollefson argues that Plaintiffs' claim that this project would result in "total

19   destruction" of an archeological resource has no factual basis, and that the project will instead

20   improve archeological resource values in the park.  <u>Id</u>., ¶ 16.

21         In her declaration, National Historic Preservation Officer and Native American Liaison

22   Jeanette Simmons explains that the project was built in 1959- 1960, before Congress enacted laws

23   to protect and preserve cultural resources.   Ms. Simmons explains the history of the development

24   of the site at length, including the salvage archeological operations that once took place there by

25   the Archeological Survey Office of UCLA.  Simmons Declaration, ¶ 4.  She explains that one of

26   the purposes in removing the old wastewater treatment facility was to mitigate the disturbance to

27   the underlying archeological site.  <u>Id</u>., ¶ 9.  Ms. Simmons describes in detail the communication

28   that has occurred with the native American tribes associated with Yosemite National Park in

regard to the project, and the plan of action which has been developed for the treatment of human remains and funerary objects that may be recovered during the removal of the waste water treatment facility.  Id. at ¶¶ 10 - 13.

In their Reply, Plaintiffs discuss the declaration of Kathy Medina, who is asserted to be a lineal descendant of Indian people buried at the site.  Ms. Medina complains of a perceived failure by NPS to consult with lineal descendants in regard to the project.  Plaintiffs note that Ms. Simons acknowledges in her declaration that the consultation process is not yet finished, and argue that the failure to consult is exacerbated by conflicting information describing what will actually happen.  Finally, they argue, without further explanation, that the use of a categorical exclusion for this project is improper.  In light of these factors, Plaintiffs ask the court to enjoin this project until a "thorough NEPA environmental review is done which provides consistent and reliable information as to what actually [sic] depth of excavation will occur, what equipment will be used, and full consultation to include this environmental review is completed."  Plaintiffs argue that in the absence of adequate review, the project will impact Merced River cultural values.

Although Superintendent Tollefson's testimony that all appropriate NEPA, National Historic Preservation Act, and Native American Graves Protection and Repatriation Act compliance has been completed weighs in favor of allowing this project to go forward, the court finds that this project involves neither routine maintenance nor health and safety issues likely to affect the public.  Combined with the undisputed fact that this project has serious potential to impact cultural values, this absence of urgency in regard to the project tips the balance in favor of enjoining this project until after the creation of a valid CMP for the Merced River.  Accordingly, the court will grant Plaintiffs' request for injunctive relief as to this project.  The court notes, however, that of all the proposed projects currently at issue, the controversy regarding project appears to have the greatest potential of resolution through good faith communication between the parties.  The court encourages the parties to seek such a resolution.

Ecological Restoration and Bank Rehabilitation

Plaintiffs seek to have the court enjoin the Ecological Restoration Project, which involves some 175 acres.  The court allowed this project to continue over Plaintiffs's objections in 2004,

1  finding as follows:

2          In regard to item 3, Defendants seek to do research and data collection for an
3   ecological restoration project in East Yosemite Valley. Defendants state that this project
    will eventually be presented for public review in an environmental assessment, but state
4   that before that document can be prepared, NPS must have more information. They seek
    the court's approval only on proceeding with a two-year university study aimed at
5   gathering this information. Thus, contrary to Plaintiffs' arguments, NPS do not now seek
    to proceed with the ecological restoration project itself or even final work towards an
6   environmental assessment. Because Defendants will be ordered to publish a new or
    revised CMP within one year, and NPS seeks to proceed on a two-year data collection
7   study prior to the production of the environmental assessment, the CMP will be completed
    before NPS produces the environmental assessment for the project, which then must be
8   presented for public review before the actual project can be started. Thus, item 3 does, as
    Defendants state, fall within the category of data collection and studies. As with items 1
9   and 2, the court will confirm NPS's ability to proceed with this study.

10  Memorandum Opinion and Order of July 2004, 37.

11          Plaintiffs now contend that in the absence of specific plans or analyses this project should

12  not proceed. They argue that neither the court nor the public can assess the impact of ground-

13  disturbing activity along the Merced River, and that there are potentially degrading elements in

14  this activity.

15          Defendants assert that the Ecological Restoration Project at issue is "subject to ongoing

16  NEPA process before any on-the-ground activity can occur." Seventh Tollefson Declaration, ¶ 63.

17  They state that the project continues to involve data gathering and scientific analysis, nothing

18  more, and that implementation may not occur for as long as one to three years. Id. They explain

19  that the goal of the projects is to protect and restore eroded riverbanks by restricting visitor access

20  to sensitive areas, and to thereby restore and protect the natural resources of the Merced River and

21  its floodplain. Id. They argue that to enjoin the data collection and planning for this project

22  would prevent them from planning for that ecological restoration. Finally, Defendants argue that

23  Plaintiffs can review any challenge to the restoration actions when NPS completes an EA for the

24  project.

25          In response to Defendants' argument that NPS is simply gathering data before beginning

26  any restoration activity, Plaintiffs argue in their Reply that NPS is proceeding with ecological

27  restoration and rehabilitation in the absence of promised environmental review. Specifically,

28  Plaintiffs assert that since 2004, there have been three categorical exclusions authorizing

1   restoration activity.  The first of these, Categorical Exclusion #2004 - 025, expressly stated that

2   the "project will be the first phase of ecological restoration for the flooded campgrounds."

3   Further, Plaintiffs demonstrate that the restoration activities anchor implementation of other

4   projects, such as the Utilities project removal of utility and sewer lines.

5          As stated above, this court has previously allowed this project to go forward without the

6   existence of a valid CMP.   In light of Defendants' assertions, the court will continue to allow this

7   preliminary planning and information gathering stage of the project to go forward.  However, in

8   light of Defendants' explanation that implementation may not occur for one to three years, the

9   undisputed fact that Camp 6 is in the Merced River floodplain and in parts is a wetland

10  immediately adjacent to the river, the court finds that the equities balance in favor of enjoining

11  any ground-disturbing activities until after the creation of a valid CMP.  It is unclear at this

12  juncture which will be completed first, the preliminary planning stages for this project or a valid

13  CMP.  Accordingly, the court will grant Plaintiffs' request for injunctive relief as to any ground-

14  disturbing activities in regard to this project until after the creation of a valid CMP for the Merced

15  Wild and Scenic River.

16  Yosemite Valley Loop Road

17         Plaintiffs seek to have the court enjoin the Yosemite Valley Loop Road project, claiming

18  that the project encompasses more than just repaving the existing road  bed.  Relying the

19  environmental assessment for the project, Plaintiffs claim that it will define or formalize roadside

20  parking areas through most of the project area with pavement, permanent barriers and curbing.

21  Plaintiffs argue that the project proposes improvements to roadside turnouts that provide access to

22  the river and to nearly trails intended to provide access to the Merced River.   Plaintiffs argue that

23  by facilitating use within the Merced River corridor, and physically impacting the area with

24  increased roadway and parking pavement, the Loop Road Project will increase access and has the

25  potential to impact the Merced River ORVs.  Finally, Plaintiffs stress that the project relies on and

26  tiers to the 2005 Revised CMP.  Plaintiffs conclude, therefore that the project should be enjoined

27  pending completion of the valid CMP.

28         In responding to these claims, Defendants state that the purposes of the Yosemite Valley

20

1   Loop Road Project are as follows: 1) to rehabilitate an existing failing roadway; 2) restore the

2   condition of the road drainage system; 3) place culverts in locations where they are need to restore

3   hydrology; 4) resurface or re-gravel existing roadside pullouts; 5) protect resources, by defining

4   the limits of pullouts using barriers (i.e., curbing and rocks); and 6) correct existing road safety

5   hazards.  Seventh Tollefson Declaration, ¶ 34.  The project is defined by the Federal Highways

6   Administration as a "3-R" transportation project, which is defined as a project consisting of

7   resurfacing, restoration, and rehabilitation activities.  Id.

8         Defendants explain that detailed environmental evaluation of the Yosemite Valley Road

9   project has been completed and documented in the Rehabilitation of the Yosemite Valley Loop

10  Environmental Assessment and Finding of No Significant Impact, including an analysis of both

11  floodplain and wetland values.   NPS has concluded that there will be beneficial effects to both

12  resources.  Id. at ¶ 35.  They argue that, contrary to Plaintiffs' claims, there will not be irreparable

13  injury to river, wetland, or visitor experience values, but that the project will instead correct and

14  restore hydrologic functions within the river corridor.  Id.

15        In response to Plaintiffs' arguments, Superintendent Tollefson states that no new roadways

16  or sections of roadways will be constructed, and that no additional roadside pullouts or parking

17  spaces will be constructed.  Id. at 36.  He further explains that the project actually prevents the

18  possibility of turnouts expanding in size, because NPS will install parking controls such as barrier

19  stones and curbing.  Id.   Finally, Superintendent Tollefson explains that the road will remain with

20  the existing road prism, thus there will be no realignment of the road.

21        At the hearing on this matter, the court denied injunctive relief as to the part of the Loop

22  Road project which involves maintenance or replacement of culverts.

23        Maintenance of the Loop Road clearly provides a benefit to the public, as the road is used

24  by virtually all visitors to Yosemite Valley.  While Defendants argue that the environmental

25  evaluation of the Yosemite Valley Road project has been completed with a conclusion that there

26  will be beneficial effects to both floodplain and wetland values, the FONSI relied upon by

27  Defendants in turn relies on the invalid 2005 Revised CMP.  Combined with the increased use

28  facilitated by the project and the potential impact to the Merced River ORVs, this factor tips the

balance in favor of the issuance of injunctive relief.  Accordingly, all portions of the Loop Road project except for the repair and replacement of culverts will be enjoined pending completion of the valid CMP.

Yosemite Valley Loop Trail

Plaintiffs seek to enjoin the development of the Valley Loop Trail, a multi-use trail throughout the entire Valley.  Plaintiffs claim that the paved trail in some places replaces existing dirt paths, and in other places will involve installing a trail for the first time.   Plaintiffs assert that the multi-use trail will provide for uses not previously available on unpaved trails, and will increase use and capacity for visitors.  Plaintiffs note that the Yosemite Valley Plan SEIS provides as follows as to one of the portions of the trail:

> Converting the trail south of the Happy Isles Loop Road between Curry Village and Happy Isles to a multi-use paved trail would result in continued and negative impacts to the fen (an alkaline wetland fed from groundwater sources located near Happy Isles) and adjacent riparian vegetation.  These impacts would be due to widening the current trail to accommodate heavier bicycle traffic, with a long-term loss of more fen habitat.  The fen is unique in Yosemite National Park, and any impacts would be considered major because of the rarity of this type of vegetation community.

AR 15478.

In response, Defendants claim that Plaintiffs' factually assertions are incorrect. Defendants rely on the declaration of Superintendent Tollefson, wherein he states in regard to this project, "no new sections of trail will be constructed, nor will the trail be widened."  Seventh Tollefson Declaration, ¶ 17.  He further explains that, "[s]ections of the Loop Trail are currently open to bicycles, but this project will not provide bicycle access to any new areas of the Loop Trail.  The improvements to the trail equate to nothing more than a routine trail maintenance project and will enhance the experience of visitors."  Id.   Defendants explain that this is not the same project outlined in the Yosemite Valley Plan, but is simply a maintenance project implementing years of overdue repairs to the trail.  Id.   Finally, Defendants state that Plaintiffs are incorrect in claiming that this project will result in the loss of fen habitat in the Happy Isles area and loss of riparian vegetation, because this project only maintains the existing trail.  Id. at ¶ 18. Defendants rely on the generic categorical exclusion for trail maintenance provided as Exhibit 7 to

1   the Tollefson Declaration.

2        In their Reply, Plaintiffs note that the categorical exclusion relied upon by Defendants

3   does not mention the loop trail.   Plaintiffs explain that they received an email from Defendants'

4   counsel which provides in part, "The trail repair and maintenance this fall will not include paving,

5   nor will it include the new "multi-use trail" discussed in the Yosemite Valley Plan to which you

6   refer.  Before any such new work on the loop trail is undertaken, the park will prepare the

7   appropriate NEPA compliance document."  Plaintiffs argue that NPS has said the same thing for

8   Camp 6, the ecological restoration, and the potential replacement of Happy Isles Bridge, yet has

9   proceeded under categorical exclusions for the first two projects and a memorandum-to-file as to

10  the Happy Isles Bridge.  For this reason, Plaintiffs state that they are not confident in the

11  representation that the proposed activity is covered by a categorical exclusion which does not

12  mention the Loop Trail, or that appropriate NEPA compliance will occur when development of

13  the new Valley Loop Trail is ready to proceed.

14       In regard to this project, the court will adopt a similar approach as it to the Camp 6 project.

15  In light of Defendants' assurances, the court will allow the routine maintenance work to go

16  forward on the Loop Trail.  It is undisputed, however, that the new development proposed for the

17  trail will increase visitor use and capacity.  Accordingly, the court will grant Plaintiffs' request for

18  injunctive relief as to any project regarding new development of the trail, including creating new

19  trail or widening or paving existing trail, until after the creation of a valid CMP for the Merced

20  Wild and Scenic River.

**ORDER**

21

22       In light of the foregoing, IT IS HEREBY ORDERED as follows:

23  1)    All evidentiary objections not previously ruled on by the court are HEREBY DENIED;

24  2)    The 2005 Revised Plan, previously found to be invalid, is HEREBY SET ASIDE;

25  3)    Defendants SHALL BE REQUIRED to prepare a legally valid Comprehensive

26  Management Plan for the Merced Wild and Scenic River within a specific time frame.  This time

27  frame will be set at the hearing on this matter which will be held on TUESDAY, JANUARY 9,

28  2007.  The parties may appear telephonically.  The parties shall agree upon a proposed briefing

1   schedule for that hearing, addressing the issue of the time frame for the creation of the CMP, and

2   file that proposed briefing schedule no later than November 13, 2006. Defendants shall file the

3   opening brief, to which Plaintiffs shall have an opportunity to respond.  No reply brief shall be

4   filed.

5   4)      Defendants SHALL COMPLY with the National Environmental Policy Act, 42 U.S.C.

6   Section 4321-4370d ("NEPA") in the development of a legally valid CMP by preparing an

7   environmental impact statement ("EIS");

8   5)      Plaintiffs' request for injunctive relief is HEREBY GRANTED as to the Yosemite Lodge

9   Redevelopment and Northside Drive Relocation project and Defendants are HEREBY

10  ENJOINED from proceeding on that project until after the adoption of a valid CMP for the

11  Merced Wild and Scenic River;

12  6)      Plaintiffs' request for injunctive relief is HEREBY GRANTED as to the Curry Village

13  Cabins and East Yosemite Valley Expanded Campgrounds and Defendants are HEREBY

14  ENJOINED from proceeding on that project until after the adoption of a valid CMP for the

15  Merced Wild and Scenic River;

16  7)      Plaintiffs' request for injunctive relief is HEREBY GRANTED as to the Yosemite Village

17  Parking and Transit Area Improvements and Defendants are HEREBY ENJOINED from

18  proceeding on any ground disturbing activities in regard to  that project until after the adoption of

19  a valid CMP for the Merced Wild and Scenic River;

20  8)      Plaintiffs' request for injunctive relief is HEREBY GRANTED as to the East Yosemite

21  Valley Utilities Improvement Plan and Defendants are HEREBY ENJOINED from proceeding on

22  that project until after the adoption of a valid CMP for the Merced Wild and Scenic River;

23  9)      Plaintiffs' request for injunctive relief is HEREBY GRANTED as to the Happy Isles

24  Footbridge and Defendants are HEREBY ENJOINED from proceeding on that project until after

25  the adoption of a valid CMP for the Merced Wild and Scenic River;

26  10)     Plaintiffs' request for injunctive relief is HEREBY GRANTED as to the El Portal

27  Wastewater Treatment Facility and Defendants are HEREBY ENJOINED from proceeding on

28  that project until after the adoption of a valid CMP for the Merced Wild and Scenic River;

11)    Plaintiffs' request for injunctive relief is HEREBY GRANTED as to the Ecological Restoration and Bank Rehabilitation and Defendants are HEREBY ENJOINED from proceeding from any ground-disturbing activities in connection with that project until after the adoption of a valid CMP for the Merced Wild and Scenic River;

12)    Plaintiffs' request for injunctive relief is HEREBY GRANTED as to the Yosemite Valley Loop Road with the exception of the portion of the request addressing the repair and replacement of culverts which was previously denied.  Defendants are HEREBY ENJOINED from proceeding on any other portion of that project until after the adoption of a valid CMP for the Merced Wild and Scenic River;

13)    Plaintiffs' request for injunctive relief is HEREBY GRANTED as to the Valley Loop Trail except for routine maintenance and Defendants are HEREBY ENJOINED from proceeding on any other portion of  project, including creating new trial or widening or paving existing trail, until after the adoption of a valid CMP for the Merced Wild and Scenic River;

14)    Defendants SHALL AMEND the General Management Plan upon adoption of a legally valid CMP.

IT IS SO ORDERED.

**Dated:    November 3, 2006**            _____ **/s/ Anthony W. Ishii** _____
0m8i78                                    UNITED STATES DISTRICT JUDGE